IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT FOR PENNSYLVANIA

JORI BRITT,                          )
                                     )
            Plaintiff,               )   CIVIL NO.
                                     )   2:22-cv-01325
v.                                   )
                                     )
                                     )
PENNSYLVANIA DEPARTMENT              )
OF CORRECTIONS, et al.,              )
                                     )
            Defendants.              )

## ORDER

**AND NOW**, this_____day of _____ 2022, upon consideration of the

Complaint, submitted herewith, it is:

ORDERED that Defendants Pennsylvania Department of Corrections, Secretary Wetzel,

Superintendent Sorber, Deputy Sipple, Major Clark, CHCA Huner, Director Silva, Donrine

Varner, Lisa West, and Amanda West, upon consideration of the Court and all parties involved

Plaintiff respectfully request this motion, this court enter an ex parte preliminary injunction

enjoining defendants, thier successors, agents, employees and all persons acting in concert with

them to provide plaintiff with an aceesable toilet in the form of single cell hosuing, a medical Z-

Code, or Handicap celling and for plaintiff to be free from any forms of retaliation in the form of

transferring plaintiff to a different SCI-Facility in an attempt to make moot plaintiff's suit in part.

Plaintiff's Preliminary Injunction Motion, is hereby GRANTED.

_____
            ,J.

Date:_____
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT FOR PENNSYLVANIA

| | | |
|---|---|---|
| JORI BRITT, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | 2:22-cv-01325 |
| v. | ) | |
| | ) | |
| | ) | |
| PENNSYLVANIA DEPARTMENT | ) | |
| OF CORRECTIONS et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS MOTION TO DISMISS PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff Jori Britt, pro se, respectfully submits this brief in Opposition to Defendants Motion to Dismiss Preliminary Injunction against Defendants Pennsylvania Department of Corrections, Secretary Wetzel, Supperintendent Sorber, Deputy Sipple, Major Clark, CHCA Huner, Director Silva, Donrine Varner, Lisa West, and Amanda West.

## I.   INTRODUCTION & PROCEDUAL  BACKGROUND

Plaintiffs complaint was filed in State Court Court Common Pleas of Montgomery County, civil cases No. (22-02851) on March 1, 2022, and was served upon the named defendants Sorber, Sipple, and Huner on March 7, 2022. Unop infromating and belief, a copy of the complaint was served upon named defendants Wetzel, Silva, and Amanda West on March 15, 2022.

On April 6, 2022, defendant filed a motion to remove Plaintiff's action from Montgomery County Court of Common Pleas to this Court (ECF No.1.) and on April 6, 2022, defendants also

filed a motion for extention of time to answer plaintiff's complaint, defendants motion was granted and giving until April 28, 2022, to file an answer to plaintiff's complaint.

On April 17, 2022, Plaintiff filed his motion for service upon named defendants Major Clark, Seretary Wetzel, Director Silva, and Lisa West and on April 22, 2022 this Court granted Plaintiff motion for service. Plaintiff now moves, to file his motion for preliminary Injunction

On May 5, 2022, plaintiff filed his motion to amend complaint as a coure of action pursuant to Federal Rule of Civil Procedure Rule 15(a) and (19)(a) and his motion for Preliminary Injunction attaching, Declaration in Support, and Amended Complaint (Doc.No.12.). Pursuant to ADAAA and RA Acy of 2008 plaintiff is rendered as an individual with a disablity who has been placed in imminent denger and suffered irreperable harm due to being denied a rang of programs, services, and activtites which are in part federally funed, as a result of the PA-DOC and all named defendants plaintiff has been denied accommodations in the form of an single cell invioation of the ADAAA, RA, and Eight Amendment (See plaintiff's Declaraton, Amended Complaint, and Motion for Preliminary Injunction).

On June 3, 2022 Defendants filed motion to dismiss plaintiff's preliminary injunction motion.

## II.   STATEMENT OF FACTS

Defendants have denied plaintiff all access to an reasonable accommodation and access to an accessible toilet in the form of single cell housing, a medical Z-Code, or Handicap Celling plaintiff has a diagnosis of various mental & physical impairments such as: (a) Anitiscial Persoanlity Disorder (b); Depression Disorder (c); Post-Traumatic Stress Disorder due to being a victim and survivor of a brutal molestation assault (d); Sleep Deficiency Disorder (e); Learning Disabilty-Disorder (f); suffers from Manic Depression (g); Anxiety; and (h) Digestive & Bladder

complications (See A/C, at 16-17, 18-19, 20-21, 22-23, see also Plaintiff's March 1, 2022, filed Exhibit List hereinafter as Id. Exhibit, see Exhibit A, at A/C). Plaintiff is substantially limted by his mental & physical impairments disabilities to proform more then one of life major activities such as: eating, sleeping, thinking, concertrating, normal digestive & bladder, bowel & urine movements (See A/C, at 19-20, 23). Plaintiff has a record of having various mental & physical impairments and receives medication for both (See A/C, at 21). Plaintiff is a qualified individual with a disability pursuant to the ADAAA, RA, & U.S. Department of Justice as defined pursauant to **42 U.S.C § 12102(1), 24 U.S.C § 12102(2)(A){2018 U.S. Dist. LEXIS 37}, 29 C.F.R. § 1630.2(i)(1)(i) § 1630.2(i)(2), 29 C.F.R. § 1630.2(J)(i), § 1630.2(J)(1)(ii), 42 U.S.C. § 12102(3)(A); 29 C.F.R. § 1630.2(h)(1)(2011), 28 C.F.R . § 35.130(b).** Due to his violent abussive childhood of being brutally molested he is unable to be housed in a prison cell setting with another man/cellmate and due to this plaintiff has had while housed at SCI-Phoenix since July 2018, over (25) cellmates in under two (2) years time period due to having physical & mental impairments which restrict's plaintiff from performing daily bodily functions & task due to this plaintiff was told to submit a request for (Z-Code) housing due to Plaintiff being housed alone while at SCI-Greterford due to his enability to be housed with another inmate and that as a result of being deined access to participate in the (Z-Code) and/or handicap celling program plaintiff was omitted into the psychiatric observation cell "POC" due to concerns for plaintiff's and his cellmate's safety (See A/C, at 16, see also Id. Exhibit A). Plaintiff's mental-illenss impariments substantially restricts his ability to be housed with or left alone in a room setting with locked doors with another man/cellmate due to being severely traumatized by being brutailly molested the lasting effects restrict's plaintiff from partially or fully exposing himself in any way to another man/cellmate restricting plaintiff from being able to gain access to and/or use

(3)

the cell-room toilet while a cellmate is present (See A/C, at 19). This restrict's plaintiff from eating daily and consuming the required daily nutients recommened by nutritions as an afford of limiting the chances of having to use the cell-room toilet while a cellmate is present causing plaintiff constant abdominal pains, exacerbating plaintiff's mental & physical health impairments, constipation digestive diagnosis, and abdominal cramps resulting in plaintiff's constant weight loss, dizzyness, detached from interest in life's activities resulting in constant trips to the Medical Sick Call Line for constant abdomenial pains and cramps (See A/C, at 20, 60). Plaintiff has requested reasonable accommodations for an accessible toilet in the form of single cell housing, a medical Z-Code, or Handicap celling but was denied (See A/C and Exhibits in A/C). Plaintiff has been involuntary exposed to over 22 cellmates in under two (2) years times and has caused serious injuries on its own and has further complicated the issues above (See A/C and Id. Exhibits in Complaint). In doing so, defendants have acted with deliberate indifference to substantial risks of serious harm; in violation of plaintiff's rights under the Eighth Amendment and due to defendants failure to granted plaintiff's repeated request for an accessible toilet in the form of a single cell, medical Z-code, or handicap celling plaintiff has been deined a range of programs services, and activities; in violation of plaintifff's right under the ADAAA and RA. All defendants were made aware plaintiff was continuing to be denied accommodations to access of an accessible toilet in the form of a medical single cell or medical (Z-Code) status and being discriminated against because of his physical & mental disabilities and that plaintiff was being subjected to relieving himself bowle movements in the unit shower in order to gain access to the shower and an accessible toilet (See A/C, at 47-48, see also Id. Exhibits J, K in A/C). As result, of all defendants failure to accommodate plaintiff suffered undue and ongoing physical & mental harm and was subjected to relieving himself in the unit shower to gain access to the shower and

where defendants through his policy directed and authorized all defendants to deny palintiff's repeated accommdation request subjecting plaintiff to physical & mental harm. (See A/C, at 49-50, 51). Under PADOC policy, plaintiff is not permitted to receive a medical single cell or medical (Z-Code) status because of his disabilities where as similarly situated inmates with less physical & mental impairments receive medical single cell or medical (Z-Code) staus plaintiff requested for an accessible toilet have been denied (See A/C, at 184-185, 186). Because plaintiff has not received approoriate physical & mental health care in the form of an accessible toilet medical single cell which would provide plaintiff with an accessible tiolet plaintiff's psychological problems are incerased causing him anxiety, loss of sleep, weight loss, panic attacts, forced withheld bowle & urine movements, helplessness, hoplessness, rage and hostility exsposing plaintiff to undue suffering and threat of tangible residual injury (See A/C, at 187-188). Pursuant to the ADAAA, RA and (DOJ) Department of Justice **28. C.F.R. pt. A. at 663(2007)** plaintiff shall be provided an accessible toilet & shower and not excluded from programs, activities, or services (See Declarartion, Amended Complaint, and Motion for Preliminary Injnction). Defendants conceded that the PA-DOC and all named Defendants have denied plaintiff's request for accommodtions for over **"two and a half years."** (See Defendants beirf in opposition).

## III.   STANDARD OF REVIEW

To obatin a preminary injunction the moving party must a prerquisites "(1) a resonable probability of eventual success in the litigation, and (2) that $\hat{o}$t will be irreperable ijuy...if relief is not granted...[in] adiition,] the district Court, in considering whether to grant a preliminary injunction should take into account, when there relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public intereest." <u>Del.</u>

(5)

Riverport Auth v. Transamerican Trailer Transport, Inc., 501 F.2d 917, 919-20 (3d Cir. 1974) (citations omotted).

## IV.   ARGUMENT

### THE PLAINTIFF IS ENTITLED TO PRELIMINARY INJUNCTION

In determing whether a party is entitled to a preliminary injunct, Courts geanerally consider serveral factors: whether the party will suffer irreperable injury, the "balance of hardship" between the parties, the likekihood of success on the merits, and the public interest. Each of these factors favor the grant of this motion.

### A.   THE PLAINTIFF IS THREATENED WITH IRREPARABLE HARM

The plaintiff alleges that he has been denied care for a serious medical need. Such conduct by the prison officials is a clear violation of the Eight Amendment, ADAAA, and RA. Estelle v. Gamble, 429 U.S. 97, 105, 97 S. Ct 285 (1976)(noting that "intentionally interfering with the treatment  once prescribded." "Constitution does not mandate comfortable prison, but neither does it permit inhumane ones and it is now settled that the treatment a prisoner receives in prison and the conditions undeer which he is confined are subject to scrutiny under the Eight amendmant." Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting rhodes v. Chapmen, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); Helling v. McKinney, 509 U.S. 25, 31 113 S.Ct 2475, 125 L.Ed.2d (1993)). "The Eight Amendment imposes duties on prison officials to 'provide humane conditions of confinement' and ensure that inmates receive adequate food, clothing, shelter, and medical care." Berndt v. Wenerowicz, 698 F.App x 673, 676-77 (3d Cir. 2007) (quoting Farmer, 511 U.S. at 832). "To establish an Eight Amendment condition of confinement claim, [Plaintiff] must show that (1) the deprivation alleged was objective, 'sufficiently serious' such that the

prison officials' acted or omissions resulted in the denial of 'the minimal civilized measure of life's necessities'; and (2) that the prison officials exhibited a 'deliberate indifference' to his health and safety." Id. at 677 (quoting Farmer, 511 U.S. at 834). "the knowledge element of deliberate indifference is subjective, not objective knowledge' meaning that the official must actually be aware of the existence of the excessive rist; it is not sufficient that the official should have been aware." Bears-Capital v. Whetzel, 256 F.3d 120, 133 (3d cir. 2001). "Denying Plaintiff access to a daily shower while he was in regular and administrative segregated housing, regardless of the policy, was cruel and unusual punishment. Days without a shower violated basic human dignity." See Small v. Commissioner Gray Lanigen, et at., United States District Court For The District of New Jersey, 2019 US Dist. LEXIS 39492919 U.S. Dist. LEXIS 3940) (quoting Estall v. Gamble, 429 U.S. 97, 102 S.Ct. 285, 50 L.Ed.2d 251 (1976). See also Partelow v. Massachusetts, 442 F.Supp. 2d 41, 50 (D.Mass. 2006) (recognizing that "reasonable access to safe bathing...constitute[s] a component of civilized living" for purposes of a disabled prisoner's Eight Amendment claim). "Prison officials may not deprive prisoners of basic necessities of life including adequate food, clothing, shelter, sanitation, medical care and personal safety. The Eight Amendment is violated if a prisoner is deprived of any of these necessities in isolation, segregation or protected custody." Casey v. Lewis, 834 F.Supp. 1569, 1581 (D.Ariz. 1995).

As a matter of law, the continuing deprivation of constitutional rights constitutes irreparable harm. Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673 (1976); American Trucking Associations, In. v. City of Los Angelas, 559 F.3d 1046, 1059-599 (9th Cir. 2009). This principle has been applied in prison litigation generally, See Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996); Newsom v. Norris, 888 F.2d 371, 387 (6th cir. 1989; Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir.1984); McClendon v. City of Albuquerque, 272 F.Supp. 1250, 1259

(D.N.M. 2003), and specifically in prison medical care cases, <u>Phillips v. Michigan Dept. of Corrections</u>, 731 F.Supp. 792, 801 (W.D.Mich. 1990), aff'd 932 F.3d 969 (6th Cir. 1991).

In addition, the plaintiff is threatened with irreparable harm because of the nature of his disability, when housed with another inmate exacerbates his mental and physical health conditions resulting in not having access to accessible toilet causing serious harm to plaintiff's person (See A/C at, 199, 200-201, Declaration, Plaintiff's Motion for Preliminary Injunction). If he does not receive proper treatment at the proper time, and accommodation for an accessible toilet in the form of a single cell due to his inability to be housed with another inmate due to being burtually molested, plaintiff will continue to suffer loss of weight, sleep, and suffer panic attacks among other things (See A/C at, 16-17, 18-19, 20-21, 22-23, 24, Declaration, and Motion for Preliminary Injunction). The PA-DOC and all Defendants are aware that placing plaintiff in a cell with another inmate exacerbates his mental & physical impairments subjecting him to constant fear of being assaulted or worse. Plaintiff has pleaded and submitted sufficient evdence that the word is out within the PA-DOC that if an inmate kills his cellmate he can receive a (Z-Code) and that PA-DOC staff are instructing inmates to harm their cellmates to receive and/or keep their (Z-Code) (See A/C, at 52 Id. Exhibit L-L4). Plaintiff attaches Anthony Vone Caiby's List of Cellmate Assault as Exhibit A). Additionally, plaitiff attaches House Appropriations Committee Budget Hearing with DOC dated 2/16/22 @ 10:00 a.m., House Floor as Exhibit B and Senate Appropriations Committee Budget Hearing with DOC &PBPP dated 2/23/21, Hearing Room 1, North Office Buliding as Exhibit C).

As notied above the PA-DOC and all defendants are aware placing plaintiff with a cellmate placing him in imminent danger plaintiff cites to Senate Appropriations Committee Budget Hearing with DOC &PBPP dated 2/23/21which provides in relevant part: Sec. Little is

aware that most people in prison have been subjected to traum at, page 7, pp-6. Rep. Struzzi inquired about the rate in violence in Pennsylvania Correctional instutitions. Sec. Little sated that, "violence was lower in 2021 because many activtives and movements within the facilities were limited to stop the spread of Covid-19 **but will rise as prisons return to normal**, that the ratio is about one correctional officers to four inmates, which is the lowest since 2000 at, page 7, pp-9. Plaintiff has set forth sufficient facts to establish placing him in a cell with another inmate not only exacerbates his mental & physical impairments but placing him in immient danger.

### B. THE BALANCE OF HARDSHIP FAVORS PLAINTIFF

In deciding whether to grant TRO's and Preliminary Injunctions, courts ask whether the suffering of the moving party of the motion is denied will out weight the suffering of the non-moving party if the motion is granted.  See, e.g., Mitchell v. Como, 748 F.2d 804, 808 (2d Cir. 1984( (holding that dangers posed by prison crowing outweight state's financial and administrative concerns); Duran v. Anaya, 642 F.Supp. 510, 527 (D.N.M. 1986) (holding that prisons' interest in safety and medical care outweight state's interest in saving money by cutting staff). The Defendants in their brief claim single cells are not easy to come by, and would certainly exacerbate the "**complex and intractable problems of prison administration.**" Just because defendants say something doesn't make it ture. Defendants are obligated pursuant to the ADAAA, RA and Eight Amendment to provide plaintiff with safe living conditions. "Prison officials may not deprive prisoners of basic necessities of life including adequate food, clothing, shelter, sanitation, medical care and personal safety.  The Eight Amendment is violated if a prisoner is deprived of any of these necessities in isolation, segregation or protected custody." Casey v. Lewis, 834 F.Supp. 1569, 1581 (D.Ariz. 1995). Plaintiff cites to **Senate Appropriations Committee budget hearing with DOC & PBPP** as Exhibit B. Which provides

in relevant part: the inmate population is down by 8,800 from March 2020 and that Gov. Wolf released 1,800 inmates, at page 2, pp-11. Plaintiff subitted an ADM-006 Inmate Accommodation Form requesting an accessible toilet in the form of a single cell (See A/C, at 60 and Id. Exhibit M). Pursuant to PA-DOC Policy under Section 5-Single Celling (Z-Code) and Double celling. It provides in releant part: (b)(c)(2) "an inordinate number of cell partners for either" Plaintiff has had over (22) different cellmates in under two (2) years time period (See Amended Complaint, at 53, 65 hereinafter A/C). Also pursuant to PA-DOC Policy under DC-ADM 11.2.1 provides in relevant parts: Section 2. Selection Criteia Governing For "Housing Concerns" (Potential Sexual Victim and/or institutional sexual predator.") Plaintiff is a victim and survivor of a brutal sexual molestation assault (See A/C, at 19 30). Additionally, pursuant to PA-DOC ADM 11.2.1 Single (Z-Code) Housing Section 5-C. Evaluating an Processing inmates for single cell status (Z-Code). It provides in relevant part: (1). C.1 "Any inmate who meets any of the following criteria **shall** be carefully reviewed by staff and considered for (Z-Code) housing classification. Staff must be aware that there are factors which may contraindicate (Z-Code) assignment or continue as well as the housing of an inmate alone in a cell (i.e., without a cellmate); § a. (b) "an inmate with certain medical conditions (an infectiouos disease, colostomy, etc.); § b.(c) "an inmate who staff believe may be victimized as a result of **double-celling, multiple celling, or placement in a dormitory.**" Plaintiff attaches PA-DOC ADM 11.2.1 Policy as Exhibit "D" Here Plaintiff plead sufficiant facts to show that without the grant of an injuncton he will continue to suffer irraparable harm to his mental and physical health and contine to face imminent danger.

In this case, the present suffering of the plaintiff and his potential suffering if he permenently loss the normal use of his bowel and digestive systeems and ability to function on a stable psychistrical level. The "suffering" the defendants will experience if the Court grants the

order will consist of providing plaintiff with access to an accessible toilet and adequate mental health care in the form of a singal cell-something that the defendants do, and are obligated to do, for members of the prison population on a daily basis. The defendants' hardship amounts to no more than business as usual. Notably, ("SCI-Phoenix") is one of the largest Pennsylvania State Institutions in the state and has not been at its capacity since its opening in July of 2018 and has available unocupied cells as to date. Defendants citing to <u>Punnett</u>, 621 F.2d at 582. for the proposition granting plaintiff motion would expire after 90 days for the reason plaintiff motion should be denied, to keep the "status que." "A public entity must make reasonable modification in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. **28 C.F.R. § 35.130(b) (7)(i).** "Under Title II, the failure of a public entity to provide disabled persons with reasonable modifications constitutes discrimination within the meaning of the [ADA]. <u>Muhammad v. Dept. of Corr.</u>, 645 F.Supp. 2d 299, 313 (D.N.J. 2008), afd sub nom. <u>Muhammad v. NJ Dept. of Corr.</u>, F.App'x 789 (3d Cir. 2010). "[A]n 'alteration within the meaning of the regulations is a change that effects the usability of the facility involved." <u>Kinney v. Yerusalim</u>, 9 F.3d 1067, 1072 (3d Cir. 1993). See also **28 C.F.R. § 35.151(b).**

### C. The Plaintiff Is Likely To Succedd On the Merits

The plaintiff has a great likelihood of success on the merits. What the defendants have done "intentionally discriminated, failed to provide adequate medical care, and denied a repeated request for accommodations" was specifically singled out by the Supreme Court as a example of unconstitutional "deliberate indifferance" to prisoners' medical needs, <u>Estalle v. Gamble</u>, 429 U.S. 97, 105,  97 S.Ct. 285 (1996). See <u>Bowring v. Godwin</u>, 551 F.2d 44, 47 (4th Cir. 1977)

("finding that no underlying distinction between the right [of a prisoner] to medical care for physical ills and its psychological or psychistric counterpart); <u>Kay v. Brewington-C</u>orr, 2000 WL 1346688 (D.Del.2000) (§ 1983 claim against prison psychiatrist who failed to provide her with appropriate medication for her panic depression). See e.g., <u>Carty v. Farrelly</u>, 957 F.Supp. 727 (D.Virgin Islands 1997) (finding that an ADA violation where inmate who used cane but was not mentally ill was, because of his disability, housed with mentally ill prisoners and this subjected to risk or injury); <u>Purcell v. Pennsylvania Dept. of Corrections, 12 Nat' I Disability Law Rep.</u>P. 41 1998 WL 10236 (E.D. Pa. 1998) (finding inmate with Tourette's syndrome and a joint disorder stated an ADA claim and department should accommodate his diseases by allowing him to remain in a **handicapped-accessible** cell or have a chair in his cell and shower room; they also had an ADA obligation to accommodate his Tourett's by letting him return to his cell when he needed to express his verva tics); <u>Frost v. Agnos</u>, 152 F.3d 1124 (9th cir. 1998) (denial of adequate shower facility to an inmate with leg brace and crutches raised § 1983 issue); <u>Saunders v. Horn</u>, 959 F.Supp. 689 (E.D. Pa. 1996) (disabled inmate's claims that prison didn't provide readily accessible bathroom and shower was an appropriate ADA claim); <u>Outlaw v. City of Dothan, Ala.</u>, 1993 U.S. Dist. LEXIS 21063 (M.D. Ala. 1993) (shower must be accessible to inmate with artificaial leg)" <u>Small v. Commissioner Gray</u>, 2019 US Dist. LEXIS 39402019 U.S. Dist. LEXIS 3940) (denying defendants summary judgment where prison denied disabled inmate an accessible show violated the ADA and Fourteenth Amendmantg) (citing <u>Muhammad v. Dept. of Corr.</u>, 645 F.Supp. 2d 299, 312-13 (D.N.J. 2008); aff'd sub onm. <u>Muhammad v. NJ Dept.</u> of Corr., 396 F.App'x 789 (3d Cir. 2010); <u>Furgass v. Dept. of Corr</u>, 2019 U.S. App. LEXIX 23680) (prison dinied inmate an accessible shower violated the ADA and where prison officials were deliberate indifferent for failing to grant inmates request for accommodation); <u>Nami v. Fauver,</u>

82 F.3d 63, 67 (3d Cir. 1996) (finding that, if proven, allegation that plaintiff's were subjected to sexual assult and that prison officials failed to protect them adequately by placing them in double cells, could establish deliberate indifference. "irrespective of whether the harm resulted from double celling or other conditions of confinement); Hughes v. Miskell, 2010 U.S. Dist. LEXIS 144355, 2010 WL 8499990, at *13(M.D.Pa.Dec. 28, 2010)(finding that, inmates' allegations that he "suffered increased episodes of anxiety and depression as well as psychotic episodes being housed with another inmate...sufficiently alleged facts from which it can be reasonable inferred that 'he is in imminent danger of substanitial injury as a result of being double-called'")(citation omittd); Cryer v. Spencer, 2012 U.S. dist. LEXIS 3477702, 2012 WL 892883, at *2 (D. Mass. Mar. 15. 2012) (upholding inmate's allegation that he had mental disorders that posed a substential risk of serious harm to himself and any inmate placed in his cell); Dys v. Drisdale, 2011 U.S. Dist. LEXIS 123748, 2011 WL 5110402, at *3 (W.D. Wisc. Oct. 25, 2011) (upholding inmate's allegations that he suffered from sever anxiety and depression, and an "eating disorder/phobie," that were exacerbated by external stimuli such as noise and presence of a cell mate); Wilson v. Tilton, 2009 U.S. Dist. LEXIS 97001, 2009 WL 324630, at *9 (E.D. Cal. Oct. 6, 2009) (upholding inmate's allegations that he threatened to kill his cellmate and suffered sleep deprivation and mental health breakdowns when celled with another inmate). Multiple courts have found the "refusal of prison officials to accommodate [a prison's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs...independently violated[] the provisions of § of the Fourteenth Amendment." United States v. Georgia, 546 U.S. at 157; See also Dinkins v. Corr.Med.Sers., 743 F.3d 633, 635 (8th Cir. 2014) ( (Listing cases finding damages awards for inmates missing meals and being denied access to toilet facilities); Jaros v. Ill, Dept. of Corr., 684 F.3d 667, 670 (7th Cir. 2012)

("Adequate food and facilities to wash and use the toilet are among the 'minimal civilized measure of life's necessities' that must be afforded prisoners.") (quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981)); <u>Dougles v. Vihidal</u>, 2012 U.S. Dist. LEXIS 73908; 2012 WL 1933569) (denying defendants motion to dismiss where inmates who alleged he was denied Z-Code accommodation for his disability prison officials violated the ADA and Eight Amendment); <u>GeGido v. Pung</u>, 702 F.Supp. 922 (D.Minn. 1989) (holding that, injunctive relief should not be granted on an inmate's Eight Amendment claims unless there is a theat of future inhumane conditions of confinement and wanton infliction of pain); <u>McCahon v. Pennsuylvania Turnpike Commission</u>, 491 Supp.2d 522 (M.D.Pa. 2007) (finding that, to establish a reasonable probability of success on the merits, the moving party must produce sufficient evidence to satisfy the essential elements of the underlying cause of action); <u>Farnam v. Walker</u>, 593 F.Supp. 2d 1000 (C.D. Ill. 2009) (finding that, inmate who allegedly was not receiving adequate treatment for cystic fibrosis did not have an adequate remedy at law, supporting the ~~;anting~~ GRANTING of preliminary injunction in his civil action under the Eight Amendment alleging deliberate indifference to his medical needs.); <u>Tara Enterprises, Inc. v. Humble</u>, 622 F.2d 400 (8th Cir. 1980) (finding that, in order to obtain  injunction or declaratory relief against public official, there must be some indication that they intended to continue the unconstitutional practice alleged in the complaint). The Defendants seek to maintain the "status que" by refusing to accommodate plaintiff and intend to continue unconstitutional practice alleged in plaintiff's complaint. See <u>Austin v. Pennsylvania Department of Corrections</u>, 876 F.Supp. 1437; (1995 U.S. Dist. LEXIS 7359 Civ. No. 90-7497) (granting preliminary injunction where PA-DOC had inadequate TB policy, RA violation, and overcrowding etc). The PA-DOC March 18, 2014 & August 1, 2019 memrandum release is in direct violation of the settlement agreement in Austin. See also Small granting

preliminary injunction for prison denying inmate an accessible shower.

Notably, the defendants intent on placing plaintiff in imminent danger of irreparable harm and injury. The PA-DOC and all named defendants despite plaintiff's repeated request for reasonable accommodations to access an toilet in the form of a single cell has subjected plaintiff to irreparable harm. Here, plaintiff has set forth sufficient facts to establish the PA-DOC and all defendants deliberate indifference to plaintiff's serious physical and mental needs. "Intentional discrimination can be shown by deliberate indifference. See S.H. ex ral. Durrell, 729 F.3d at 263 ("We now following in the footsteps of a majority of our sister courts and hold that a showing of deliberate indifference may satisfy a claim for compensatory damages under § 504 of the RA and § 202 of the ADA) Plaintiff has plead at the pleading stages that the PA-DOC and all named defendants are deliberate indifferent, has denied plaintiff's repeated request for accommodation for an accessible toilet in the form of a single cell, and have denied plaintiff's request for accommodation due to his disability therefore, subjecting plaintiff to cruel and unusual conditions and confinement and resulting in. a continued denial of a range of programs, services, and activities which are supported by federal funding. Plaintiff has adequately set forth sufficient allegations to show that he suffers from being a victim and survivor of a brutal molestation assult, the signs and symptoms pusuant to **PADOC Access to Health Care Proceduals 13.2.1. Section 14** Plaintiff **attaches PADOC Access to Health Care Procedures 13.2.1. Section 14** signed by Defendant Wetzel as Exhibit "E". It provide in relevant part:

    4.     Sexually abused Inmate A. Signes & Symptoms:
    a.     "relectance to be touched; difficity in sitting boundaries with others;difficulty in trusting peopel; depression; fear/paranoia self-inflicted injuries."

As noted within the Amended Complaint the PA-DOC and all Defendants, failed to follow **PADOC ADM-006** Policy which provides in relevant part:

    **III. POLICY** "It is the policy of the Department to establish procedures

(15)

for an inmate to request an accommodation for a qualified disability that
A. Every inmate, including an inmate with a quaified disability, is housed
in a manner that provides for his/her safety and security."

Plaintiff attaches **PADOC DC ADM-006** Policy as Exhibit "F".

Additionally, the PA-DOC and all Defendants failed to follow PADOC ADM-006 Policy

in relevant parts:

5.    **III.** (B)(C)(E)(F);
a.    **Section-1-General Procedure:**
b.    A.    Classification/diagnosis(2)(3)(4);
c.    B.    Facility Placement 1.;
d.    C.    1. Inmate Work Program (1)(2);
e.    D.    Staff traning.

6.    **SECTION 2- ACCOMMODATION:**
a.    A.    Request for Accommodation (1)(2)(3);
b.    B.    Review of the Inmate Disability Accommodations Request Form(1)(a)(b)
          (c)(d)(e)(f);
c.    C.    GRNERAL ACCOMMODATIONS (2)(3)(4)(5)(6)(7);
d.    D.    PROGRAMS/SERVICES ACCOMMODATIONS (2)(3)(4)(6);

7.    **SECTION 3-SPECIFIC DISABILITIES (A)(D);** and
a.    **GLOSSARY OF TERMS** Pages (1)(2)(3).

The PA-DOC and al Defendants are aware that plaintiff's mental & physical health

impairments are serious. Plaintiff attaches **REPORT Of THE ADVISORY COMMITTEE ON**

**GERIATRIC AND SERIOUSLY ILL INMATES** dated jun 22, 2005 as Exhibit G). Which

provides in relevant part: **DEPART MENT OF CORRECTIONS DEFINITIONS AND**

**DSM-IV DIAGNOSES** at, pp-192-193, 194-195. Here plaintiff has set for sufficient facts to

show that PA-DOC and all Defendants have violated their own policies and denied plaintiff's

repeated request for accommodation due to his physical & mental disabilities and continue to

violate plaintiff's protected right pursuant to the ADAAA, RA, and Eight Amendment. The PA-

DOC DC ADM-006 Inmate Accommodation policy is governed by the ADAAA and RA but

despite all defendants knowledge of such they continue to violate it.

**D. The Relief Sought Will Serve The Public Interest**

In this case, the grant of relief will serve the public interest because it is always in the publlic interest for prison officials to obay the law, especially the Constitution. <u>Phelps-Roper v. Nixon,</u> 545 F.3d 685, 690 (8th Cir. 2008); <u>Duran v. Anaya,</u> 642 F.Supp. 510, 527 (D.N.M. 1986) ("Respect for law, particularly by officials responsible for the administration of the State's correctional system, is in itself a matter of the highest public interest."); <u>Liewelyn v. Oakland County Prosecutor's Office,</u> 402 S.Supp. 1379, 2393 (E.D. Mich. 1975) (stating "the Constitution is the ultimate expression of the public interest.") The safety of inmates and inmates with mental health needs is of great public interest See **House Appropriations Committee Budget Hearing** with DOC dated 2/16/22 @ 10:00 a.m., **House Floor as Exhibit B and Senate Appropriations Committee Budget Hearing with DOC &PBPP** dated 2/23/21, Hearing Room 1, North Office Buliding as Exhibit C). In this regard for the reasons stated above, the defendants motion to dismiss plaintiff's motion for preliminary injunction should be denied.

**WHEREFORE**, plaintiff pray and respectfully requests that upon consideration of this motion, this court enter an ex parte preliminary injunction enjoining defendants, thier successors, agents, employees and all persons acting in concert with them to provide plaintiff with an aceesable toilet in the form of single cell hosuing, a medical Z-Code, or Handicap celling and for plaintiff to be free from any forms of retaliation in the form of transferring plaintiff to a different SCI-Facility in an attempt to make moot plaintiff's suit in part.

Date: <u>JUNE 30</u>, 2022

Respectfully Submitted
JORI BRITT
Inst. No. KJ-9477
SCI-Phoenix
P.O.Box 244
Collegeville, PA 19426

## CERTIFICATE OF SEVICE

I certify that I am this day serving a true and corect copy of the foregoing Oppostion to Defendants Motion to Deny Plaintiff's Preliminary Injunction Motion is to the following person/s as indicated below and the manner as follows:

**U.S. Psotal Sevice via First Class Mail (1 copy):**

Matthew Skolnik
Deputy Attorney General
Office of Attorney General
Attorney I.D. No. 89423
1600 Arch Street, Suite 300
Philadelphia, PA 19103

Date: _JUNE 30_, 2022

Respectfully Submitted
JORI BRITT
Inst. No. KJ-9477
SCI-Phoenix
P.O.Box 244
Collegeville, PA 19426

# EXHIBIT A

## LIST  OF ASSAULTSS

### LIST OF CELLMATES WHO ASSAULTED ME IN BOTH sci  phoenix and graterford

1) lajuan walker A-BLK A-

2) JIMMY CAINE  D BLOCK B-1=12 CELL

30  MICHEAL LEACH

4)  ANTHONY SCHMIDTD-BLOCK B-1-12 CELL

5) MICHEAL BLACKSTONE D BLOCK B-1-12 CELL

6)  MIKE WHITE D BLOCK  B-1-12 CELL

7)  HASAN HILL D B BLOCJ B-1-12 CELL (FAMILY VISIT  10-3=10-4-17 SAW ME CUT SEE PIC)

8) MALIK GLEAVES D  BLOCK B-1-12 CELL

9) JALINE HARRIS D BLOCK  B-1-12 CE;;

MOVED  TO  SCI PHOENIX  SINGLE CELL  UNTIL RETURN  FRO, WRIT TO MONROE COUNTY
1-27-19  AD SEGED UPOM TELLING OF CUTTINGS

10) MILE POLLOCK SCI PHOENIX  D-BLOCK  B-2-07 CELL

11) GREG BROWN  D BLOCK B-2-07 CELL

12)  MIKE  KING  G BLOCK  B-2-05  CELL   ASSAULT  11-25-19   WENT  TO  ABINGTON  AND
JEFFERSON

13) GREG SANDERS G-BLOCK-A 2-18 CELL Z- CODED  12-10-19 WENT TO RHU 45 DAYS  BUT
DTU DIVERSIONARY TREATMENT UNIT  15 DAYS Z-CODE SINGLE CELL  NO ONE TOLD OF
STATUS CUT TWICE  3-29- AND 4-6-20 ARRACKED 4-7-20  NO PICTURES TAKEN LIKE 11-26-19

CUTS MOSTLY DONE DURING SLEEP BURN CENSOR 3RD CUTICLE DOWN  SEE PA DOC TAPE
NO77011235699072-9-1-16-PRESENT  ALSO CUT TWICE  IN THE COUNTY MCCF INMARE NO
200603081 A NTHONY VONE CAIBY  MCCF TAPE NO 77801123445699821-2-22-13-PRESENT
CUT 2-2-15 AND 3-6-16 ON  A BLOCK MCCF AND POISONED HOW /WHY?

RESPECTFULLY

I Anthony Vone Caiby HX-8170, hereby swear under the penalty of perjury that all
facts, claims, and/or matter stated herein is true, correct and not misleading puesuant
to 18 Pa C.S. § 4904 Executed on this _____ day of _4_ 2022

# EXHIBIT B

said. He asked what the secretary sees for the department's workflow. Sec. Little reported that only about one percent of workers are teleworking. He stated that many parole agents have gone mobile and staff is rotating through field offices. He continued that parole is looking to eliminate certain field locations and consolidate those spaces, however, there are some issues concerning long-term leases.

Chairman Browne remarked that there is a need to investigate the need for physical space and noted that a large percentage of the workforce does not need to operate in offices. He stated that in-person interactions will continue to be important, however, Chairman Browne questioned if there the department anticipates returning to normal overtime hours. Sec. Little said he is hopeful that the department may return to normal.

Chairman Browne thanked Sec. Little for focusing on performance-based information during the hearing. He commented on the fact that 10,000 inmates will undergo MAT. Sec. Little added that he would like to offer more support for MAT in the community. Sec. Little explained the department is working hard to evaluate programs and eliminate bad programs.

Chairman Browne explained the Senate is able to consider its financial position on a multi-year basis because of its current financial capacity. He remarked that there were many one-time federal resource allocations that need to be examined. He noted that there is still work to be done in addressing the state's structural deficit and detailed that he sees reducing incarceration rates as a method to do so.

## House Appropriations Committee budget hearing with DOC
*2/16/22, 10:00 a.m., House Floor*

The committee held a budget hearing with the Department of Corrections (DOC) represented by:

- <u>George Little</u>, acting secretary;
- <u>Christopher Oppman</u>, deputy secretary for administration;
- <u>Tabb Bickell</u>, executive deputy secretary for institutional operations; and
- <u>Kelly Evans</u>, deputy secretary, Office of Reentry.

1. Sec. Little noted he grew up in Harrisburg and pursued higher education in Georgia and Texas before working in the department of corrections in Tennessee for 34 years. He stated that he has worked with DOC for six years.

Rep. Greiner explained state correctional institutions are funded at $2.16 billion in the governor's budget, which includes an increase of 4 percent from 2020. He noted Gov. Tom Wolf's budget anticipates the correctional institutes to be funded less every year until 2025 where it will level out at about $2 billion. He detailed that DOC's presentation in October 2021 expected a 3-percent increase in funding each year through 2025. Rep. Greiner asked why the governor did not include DOC's predictions. Sec. Little stated that he was unsure of the reasoning but noted there have been more releases due to COVID-19. "There is some sense that perhaps we can sustain this level of population," he said. Sec. Little noted that most courts have removed their COVID-19 restrictions but DOC has not seen a significant increase in population. "I think the elephant in the room is where we go with our capacity and I think that's a question that's best tied to a larger discussion of our commonwealth's criminal justice policies and also future administrations to determine how best to utilize the bed capacity that we have," he said.

2. Rep. Greiner asked if it's realistic to assume the state correctional institution appropriation will decrease. Sec. Little reiterated that the conversation should be held in a larger conversation regarding criminal policies. He added the decrease takes regular salary and benefit increases. Sec. Little reported that there has been a reduction of 8,900 inmates since March 2020. Rep. Greiner said he doubted the reduction. He explained that inmates who maintain close communication with family members have a lower level of recidivism and a higher income once they are released. He asked what efforts are being done to increase communication. Sec. Little said DOC is bringing back in-person visitation on March 1 and is currently determining if they will provide transportation to the facilities. He stated that there have been more than 60,000 video visits, which have proven to be extremely successful. "I do see us continuing to expand that," he said.

3. Rep. Webster noted Sec. Little included an $8.7 million increase in medical expenses. He asked how DOC intends on recruiting more nurses. Sec. Little stated that the DOC is continuing to deal with staffing shortages. He explained that DOC does not provide especially competitive nursing positions. He added that the department will need to recruit more nurses as the aging population in prisons increases. Oppman explained that those who are aged 50 or older are considered aging in the prison system. He stated that the number of aging inmates increases 1 percent each year and 26 percent of all inmates are part of the aging population. Oppman reported that there are 115 nursing vacancies within the Pennsylvania prison system. "We're actually seeing these vacancies increase," he said. "We're working with the office administration on the recruitment side to identify different ways we can be competitive to get those positions." Rep. Webster stated that the legislature may take some action to allow DOC to create competitive nursing positions.

4. Rep. Webster inquired about connecting inmate veterans to their Veterans Affairs benefits after release. Sec. Little stated that he has developed a robust veteran's program with the Department of Military and Veterans Affairs (DMVA). "We've developed a number of veteran's service units at our facilities," he said, including addressing issues regarding post-traumatic stress disorder, life management skills and successful reentry.

5. Rep. James reiterated the differences between the governor's budget for DOC and DOC's anticipated budget from October 2021. He asked if it is reasonable to flat-line medical costs for inmates. Sec. Little stated that a flatlined budget would be an appropriate assumption considering a lower general population. Oppman stated that DOC has filed $190 million in reimbursements from the Federal Emergency Management Agency (FEMA). He stated that the spread of COVID-19 will determine how much money will be allocated to medical resources for those patients or the aging population. Rep. James asked if the governor's office consulted DOC when outlining their budget. Sec. Little stated that they were consulted but did not have extensive conversations regarding the budget. Oppman stated that $130 million have been identified as being spent related to COVID-19.

6. Rep. Kim stated that more women than ever are entering the prison system and diagnosed with mental health issues. She stated that this often separates families and places children in foster care. She inquired about programs for women in prison. Sec. Little stated that there has been "tremendous emphasis on mental health services for women. He stated that most people in prison have been subject to trauma. Bickell reviewed several programs that use trauma-informed care methods, such as House of Hope. Rep. Kim noted that some people are ill-prepared to return to society and asked if DOC has caseworkers who work with people as they exit prison. Sec. Little stated that there is little DOC can do for inmates that max out their sentence, but those in parole have several services they can use. Evans stated that she works with inmates to get Social Security cards and other ID through the Social Security Administration and the Department of Transportation (PennDOT).

7. Rep. Schroeder stated the governor's budget increases the state's filed supervision line item for DOC to $160.6 million but it will flatline in the next years. She questioned if that is due to a decrease in the corrections population. Sec. Little agreed and noted that there has been an increase in the number of parolees who have completed the program. He explained that the probation population has not increased as much as his predecessor thought. Rep. Schroeder asked why that was not included in the DOC's October 2021 budget. He stated the prison population has not increased as much as expected. He reiterated that much of the prison population is determined by the impact of criminal justice policy.

8. Rep. Kinsey stated he has legislation that would release elderly and infirmed inmates. He asked if DOC would support that bill. Sec. Little agreed, noting the high medical costs of health care for older inmates. He stated the average cost to house a healthy inmate is $40,000 each year, but $50,000 to $100,000 for a chronically ill inmate. Rep. Kinsey asked if DOC will limit the number of visits after in-person visitation is allowed after March 1. Sec. Little said DOC will work hard to return to pre-COVID-19 conditions of visitation. Oppman stated that prisons are always limited by the occupational capacity of their buildings. He stated there were 45,000 in-person visits in August 2020 and there have been more than 1 million video visits since the start of the COVID-19 pandemic.

Rep. Zimmerman questioned about the time-off reward for vaccinated staff. Sec. Little stated the incentive was effective in raising vaccination rates and has limited the amount of leave staff needed to take in case of infection or quarantine.

Rep. Sanchez encouraged Sec. Little to expedite record requests from the Board of Pardons. He asked the secretary to comment on inmate nutrition. Sec. Little stated that the nutritional value of prison food is continuously evaluated and that better food reduces medical costs because inmates are able to be healthier. Oppman added that DOC consults with dietitians and works with their vendors.

9. Rep. Struzzi inquired about the rate of violence in Pennsylvania correctional institutions. Sec. Little stated that violence was lower in 2021 because many activities and movements within facilities were limited to stop the spread of COVID-19 but will rise as prisons return to normal. Rep. Struzzi asked if staff to inmate levels are appropriate within prisons. Sec. Little stated that the ratio is about one correctional officer to four inmates, which is the lowest since 2000. He noted that it is a result of the population drop due to COVID-19. He stated that it is difficult to recruit new correctional officers when there is high competition within the labor force.

Chairman Saylor questioned if captains and lieutenants are not receiving pay increases. Oppman stated that they have not but it has been sent to e-board for resolution.

Rep. Krueger explained that taxpayers pay 96 percent of DOC's budget. She also noted that DOC's prison population is directly impacted by criminal justice policy. She asked if DOC has criminal justice reform proposals to lower costs. Sec. Little stated that DOC is currently working to implement the Justice Reinvestment Initiative but

compassionate release would also be beneficial. He suggested instituting juvenile justice reform and education to lower the rates people commit crimes. Rep. Krueger asked if there has been any workforce development effort that has been particularly successful. Sec. Little suggested the creation of programs to move released inmates into fields that need employees such as truck drivers. He added that DOC is working to expand other programs.

10. Rep. Wheeland noted that the correctional education and training appropriation is increasing $3.2 million or 7.4 percent, he questioned why that is. Sec. Little explained that some of those involve collective bargaining agreements for pay increases, but there is some vocational training that will be expanded. Rep. Wheeland asked what incentives DOC has to encourage inmates to further their education. Evans stated that each inmate is evaluated for furthering their education and their diploma rates are higher than in the wider community. Sec. Little stated that Pennsylvania could provide sentence credits for those participating in education as well as work programs that train inmates and pay prevailing wages.

11. Rep. Kinkead questioned if people with opioid use disorder in prison have access to medication-assisted treatment (MAT). Sec. Little remarked that DOC has an assessment regarding drug disorders and is cleared for programs. He pointed out the difficulty of connecting individuals with communities, but those inmates are assigned social workers to help remedy the situation. Rep. Kinkead asked if Sec. Little believes the use of MATs mitigates costs by avoiding acute withdrawal treatment that is needed in facilities. Sec. Little stated that treatment is important and prisons struggled with individuals detoxing during the pandemic. He added that DOC is conducting a study on MAT's effect on recidivism rates. Rep. Kinkead inquired on the number of individuals with chronic conditions. Sec. Little reported that about 50 percent of inmates are considered vulnerable and suffer from a variety of diseases such as diabetes or pulmonary conditions. Rep. Kinkead asked how many inmates develop chronic conditions while in prison. Sec. Little stated that he is unaware, but many have been failed by the "social safety net" while free.

Rep. Owlett reiterated the differences between the governor's budget for DOC and DOC's anticipated budget from October 2021. "I can't imagine a whole lot changed in a few months," he said. Sec. Little stated that he is confident in the governor's proposal. Rep. Owlett voiced his doubt. Sec. Little explained the department has been "a good steward over the last eight years" and he looks forward to discussing the topic in greater detail.

Rep. Mullins asked if Sec. Little has seen the positive effects of preventative care measures. Oppman stated that all inmates are evaluated and are placed in chronic care depending on their diagnosis. He added that those inmates are checked regularly and educated on their disease.

12. Rep. Mihalek explained that inmates participating in education are less likely to reoffend and are more likely to obtain employment after release. She stated that many inmates have learning disabilities and asked if DOC tests for learning disabilities. Sec. Little replied in the affirmative and remarked that DOC is working to institute a new risk-need regimen in August. Sec. Little estimated that the department is likely underdiagnosing the rates of learning disabilities. He said he is open to bettering the department's testing methods.

Rep. Cephas reported that about 66 percent of female inmates have mental health challenges. She asked how the DOC addresses this. Sec. Little stated that it's important to recognize that inmates' needs are relative to their trauma. He stated that DOC is taking a more gender-specific approach to supervision. He explained those programs work to solve behavioral issues. Sec. Little Explained that Doula Care works to support pregnant inmates and provide a continuity of care.

13. Rep. Ecker questioned the department's overtime costs. Sec. Little stated the vacancy rate has forced the department to mandate overtime for some staff. He added that corrections staff has used more than 1 million hours of COVID-19 leave. Sec. Little said he is working on improving recruitment and attracting applicants, including from colleges. Rep. Ecker asked if mandatory overtime drives people out of their jobs. Sec. Little said that some staff members have burnout, but the department is hoping that it will improve as COVID-19 restrictions are lifted. Rep. Ecker asked if the department is open to a mandatory overtime audit related to its retention rate. Sec. Little agreed to an audit.

Rep. Bullock asked about DOC's diversity. Sec. Little said staff is 80 percent male, 6 percent Black and 4 percent Black female. He reiterated the department's difficulty in recruitment and retention. He added that DOC is working to create healthy workplaces. Rep. Bullock said she appreciates the secretary's efforts. Rep. Bullock asked if the department will continue its transportation program for those visiting inmates as well as video calls. Sec. Little said DOC is working to determine if the transportation program will continue and is creating a "comprehensive solution" to address video calls. Sec. Little said he doubts the department's ability to maintain those programs in their current state.

14.  Rep. Hershey inquired about correctional institutes' high vacancy rates. Oppman reported that about 50 correctional officers are attrited each month and many are also retiring. He noted that hiring incentives will need to be collectively bargained. Sec. Little said DOC is working with nursing staff for flexibility and are exploring other options. He added the department is also advertising more widely to recruit new staff. He explained that entry-level officers are paid $20 per hour with benefits. Sec. Little said the department is working to increase its employee surveys to determine how to increase retention.

15.  Rep. Guzman questioned if DOC is creating a dementia wing and if those individuals could be candidates for compassionate release. Sec. Little said the department currently has a unit for those individuals and agreed that they could be released if that legislation were passed. Rep. Guzman criticized the Pennsylvania justice system for imprisoning individuals if they are unable to pay bail or afford a criminal defense attorney. He asked if Sec. Little supports the governor's efforts to broaden indigent defense. Sec. Little agreed. Rep. Guzman asked what legislative policies he would recommend to curb violent gang activity. Sec. Little stated the department is not as involved in gang activity as it could, however he is working with schools to create a pilot project to stop children from joining gangs. He stated legislation would best "come from the local level up."

Rep. Rothman asked if DOC is aware of the concerns regarding unsafe facilities in Philadelphia prisons. Sec. Little said he was aware but has been unable to conduct a formal inspection due to the pandemic, although he expects that inspection to occur soon. He stated the department is working on several trainings to take care of staff.

Rep. Brown asked Sec. Little to detail medical copays in prison. Sec. Little said the copays are $5, although they were suspended during the majority of the COVID-19 pandemic and other exceptions exist for those with chronic conditions. Rep. Brown questioned how much inmates make in their prison jobs, Oppman reported that they make 19 to 42 cents per hour. Sec. Little explained that much of that pay is used for commissary purchases. He stated that he would rather provide educational opportunities and reiterated his support for prison-industry expansion. Rep. Brown explained that those wages hardly cover inmates with cable bills and it makes sense that many are unable to pay a $5 medical copay. Rep. Brown asked if DOC is open to increasing the number of minority-owned vendors it works with. Sec. Little said he is encouraging that through their procurements. Oppman stated that the Department of General Services (DGS) determines much of DOC's procurements.

16.  Rep. Fritz reiterated questions regarding the cost of housing healthy inmates and chronically ill inmates. He asked how much it costs to manage a parolee. Sec. Little said it is $9 per day, which is significantly cheaper. Rep. Fritz explained that corrections officers earn about $30 per hour when benefits are incorporated.

Rep. Lawrence asked about the average length of time that an employee is on leave with COVID-19. Sec. Little reported that staff may take up to 20 days of leave did not have an average number. Rep. Lawrence asked if DOC grants COVID-19 leave to anyone who claims it or if there is a follow-up process. Sec. Little said there is follow-up and doctors must give a statement or other documentation.

7.  Rep. Heffley asked if DOC anticipates the inmate population to continue falling. Sec. Little said he thinks the population will decrease in the near term but will balance itself. Rep. Heffley pointed out that crime and parole violations have increased in Pennsylvania during the pandemic, he questioned how a decrease in population could occur. Sec. Little said parole is managing less serious violations. He added that he did not believe released individuals were committing higher rates of crime. He reiterated the need for a wider criminal justice policy discussion. Rep. Heffley emphasized the importance of the prison system in keeping people safe.

Rep. Culver commented on the high cost of medication for inmates and noted that the governor's budget requested $7 million to create a unit of beds for elderly inmates leaving correctional facilities with complex medical or behavioral health needs. Sec. Little said his staff works hard to place individuals slated for release in the facilities the department currently utilizes. He noted that the individuals are free after release and may decline. He explained that there are only several dozen in the program.

Rep. Topper referenced the issues of Philadelphia prisons and the importance of "surprise inspections." He reiterated concerns regarding the governor's budget and DOC's October 2021 budget. Sec. Little said he gave the governor's office "our very best estimate of what our operations would be." Sec. Little explained that he is confident in the governor's estimate. Rep. Topper asked if merging the probation department with DOC has been effective. Sec. Little stated that it has been successful and allowed for greater coordination. Rep. Topper asked how technology has changed prisons. Sec. Little stated that it has allowed prisons to better monitor inmates and solve crime.

# EXHIBIT C

**Senate Appropriations Committee budget hearing with DOC & PBPP**
*2/24/21, Hearing Room 1, North Office Building*

The committee held a budget hearing with the Department of Corrections (DOC) and the Pennsylvania Board of Probation and Parole (PBPP) represented by:

- **George Little**, acting secretary, DOC,
- **Tabb Bickell**, executive deputy secretary for institutional operations, DOC,
- **Christopher Oppman**, deputy secretary for administration, DOC,
- **Theodore Johnson**, chairman, PBPP,
- **Christian Stephens**, deputy secretary for Office of Field Services, PBPP.

Chairman Browne noted the governor's budget requests $2.77 billion for DOC, which includes federal augmentations.

*1,*  Sec. Little said he looks forward to meeting with individual members of the committee on a one-on-one basis. He described his background as a Harrisburg native and his various work in the Tennessee Department of Corrections. He noted that he has worked with DOC for six years.

Chairman Brown said the committee has had a productive relationship with Sec. Little's predecessor and looks forward to continuing that relationship.

*2,*  Sen. Baker said the COVID-19 pandemic has had an unprecedented impact on the prison system. She thanked workers and correctional officers for their efforts. She asked if DOC has tracked the deaths related to the pandemic. Sec. Little reported that 175 inmates and 12 staff members have died due to COVID-19. He commented that staff and inmates are part of the same community.

*3,*  Sen. Baker said "It's remarkable that the number isn't higher" and is evidence of strong efforts of virus mitigation. She reported DOC received significant COVID-19 relief funds. She asked Sec. Little to account for those expenditures, including spending for overtime hours. Sec. Little explained the department has a detailed accounting of expenses in order to submit them to the Federal Emergency Management Agency (FEMA). He emphasized the expenditure of federal funds has been limited to those specifically related to the pandemic. Oppman reported that the total number of pandemic-related funds spent is $1.45 billion, which has come from Coronavirus Relief Funds (CRF). He added $1.275 billion of that cost has been attributed to personnel costs outside of overtime. Oppman reported that $198 million has been billed to FEMA, which mostly contains overtime payments.

*4,*  Sen. Baker stated that new budget will not include the same amount of funds as the federal government rolls back the relief funds. She questioned how DOC plans to scale back the amount of funding. Sec. Little said that the COVID-19 risk will continue to be managed, and he plans to discuss with his staff ways of returning to normal. He noted the department must continue to provide personal protective equipment (PPE). He attributed the low mortality rates to the use of PPE and vaccinations.

*5,*  Sen. Baker asked if DOC plans to supplant federal funding with existing state funds and questioned if the department will come back looking for more funds. Sec. Little said there were enough state funds to provide a "cushion." He explained that as federal funding became available the department already had the dollar amounts tabulated and was easily able to account for those expenditures that were associated with the COVID-19 pandemic.

*6,*  Sen. Baker said she is concerned about the vacancy rates of correctional officers, stating that it's a safety risk. She commented nursing staff numbers are also down. She inquired how DOC's plan to attract and retain corrections officers. Sec. Little explained he is working with the Wolf administration for recruiting campaigns. He detailed that although corrections officers were historically prized jobs, he is finding DOC is now having to search for candidates. He detailed various job fairs and outreach campaigns. He added DOC is working with vendors and contractors to encourage recruitment and retention for themselves.

Sen. Baker asked if the department should adjust the wage scale for new hires. Sec. Little said he has ongoing discussions with the Office of the Budget. "Although we have our own thoughts, it has to fit within the larger scale," he said.

*7,*  Sen. Baker reported the Department of Human Services (DHS) was appropriated $7 million for those aging out of DOC. She explained that staff members have talked about the difficulty of placing former inmates in the community. "I'm hoping we can we can work together on a pilot program or an initiative that builds that capacity," she said. "The last thing we need is a program to encourage people to come back and then not be successful." Sen. Baker mentioned that it is important in order to draw down federal Medicaid and Medicare costs. Sec. Little reiterated the difficulty to place those who are aging or have mental health issues. He explained that those who have maxed out of their sentences are "not legally our responsibility but we do our best to work with them," he said. Sen. Baker said she looks forward to working with DOC to craft a policy "that makes sense."

Sen. Santarsiero reiterated that those who have maxed out of their sentences or have been exonerated are not eligible for the same services that are provided to parolees. He asked if the department has any data on recidivism rates for reentry between those who have maxed out and those who are receiving services by virtue of their parolee status. Sec. Little said recidivism, in general,

continues to drop, which is likely due to reentry programs inmates receive while still imprisoned. He explained that those individuals are free once released and are able to deny services, however, DOC does provide services to those who are interested in community-based programs. "We can't do that with max-out cases," he said. Sec. Little said DOC provides medical and substance abuse treatment as well as employment and housing assistance to parolees. He explained that he could provide recidivism data at a later time.

Sen. Santarsiero stated that DOC should study the efficacy of reentry services and added that it would help the Senate decide if the programs should be expanded. Sec. Little said he would further investigate the matter.

$\mathcal{B}.$

Sen. Santarsiero explained Pennsylvania is one of several states that does not provide indigent defense and questioned if it contributes to greater numbers of incarceration rates. Sec. Little said DOC does not keep that data, but he comes from a state that does provide indigent defense and it seems to make a positive difference. He explained that indigent defense helps individuals get parole or treatment rather than prison time.

Sen. Santarsiero questioned if there had been any studies comparing Pennsylvania to other states with indigent defense. Sec. Little said there are no such studies.

$\mathcal{9}.$

Sen. Santarsiero emphasized the role that poor mental health plays in imprisonment rates. He stated that he was pleased to see Gov. Tom Wolf propose a budget with an increase of $34 million for mental health services. Sen. Santarsiero detailed that society's shortcomings in dealing with mental health lead to more people going into prison. He questioned the number of inmates with mental illness. Sec. Little stated that 35 percent of inmates have mental health issues, noting that DOC is the largest provider of mental health services in the state. He detailed that some cases of mental illness start in the community while others develop after arriving in prison. Sec. Little stated that DOC personnel work to intervene in mental health episodes for the safety of other inmates, staff, and the individual experiencing the episode. He reported that females have higher percentages of mental health. He reviewed the training field agents undergo to keep parolees stabilized.

Sen. Santarsiero asked if the rates of mental illness have increased during the pandemic. Sec. Little reported the percentage has stabilized and the department is looking to improve reception diagnostics for mental health. He remarked the department makes every effort to place those individuals with mental health services in the community upon release.

Sen. Santarsiero questioned if there was historical data on mental health in Pennsylvania prisons. Sec. Little said there was data going back 10 years and he would provide that information.

Chairman Browne noted that mental health in prisons has been discussed for many years in General Assembly and endorsed the discussion.

$10.$

Minority Chairman Hughes detailed a water issue at SCI Rockview. He noted that previous hearings have detailed programs to increase training individuals on lead removal and lead abatement. He asked for updates. Sec. Little said the issue is "moving" and is part of discussions regarding prison's recovery from COVID-919. "We're going to ramp up our training generally," he said. "We think lead training and prevention is part of it." Sec. Little stated that many aspects of training have gone virtual but will resume in-person training in the summer.

Chairman Hughes noted Pennsylvania has a big problem with "old buildings," especially housing having lead-based paint. "The idea of having an aggressive effort to remove that seems to make sense across the board," he said. Sen. Hughes questioned incidents involving contaminated blue water at SCI Rockview. Sec. Little said he was aware of some water issues going on and would investigate the situation to determine if it is a problem with the facility's water supply or the greater community.

$11.$

Sen. Argall said he and Sen. Baker introduced a bill to require notification if a corrections institution was slated for closing. He asked if DOC plans to close any prisons in the future. Sen. Little said he is aware of the legislation, and he does not plan to close any institutions. He stated that prison capacity will depend on future criminal justice policy. He reported that the prison population is down by 8,800 from March 2020. He said he believes we need to keep the current capacity as it helps to move inmates around to provide for the safety of staff and inmates. "I think we need to look at future capacity relative to sentencing and programming," he said. Sec. Little said his processor put a premium on flexibility which he continues to believe. "We need to have the flexibility for health or safety reasons so that there is a proper mix of staff to the inmate population," he said.

Sen. Argall reported Gov. Wolf coordinated the release of 1,800 inmates. He inquired on how many have been returned to prison. Sec. Little reported there were 159 reprieves and 69 individuals were returned for various reasons, none involving violent crimes. Sen. Argall asked how many were returned for the same reason they were put in prison. Sec. Little stated that none were, but were instead brought back because of mental health issues. He remarked that some destabilized in the community and were brought back to allow DOC to better treat them.

$12.$

Sen. Argall remarked on general staffing issues, noting that mandatory overtime is unpopular. He asked how DOC plans to address the issue. Sec. Little explained that recruitment has already been addressed, however, retention is also important. He detailed the initial pay for new hires is "good," but not significantly competitive. He remarked that some warehouses offer similar pay. Sec. Little

recommended that outreach should focus on emphasizing that working for the commonwealth is a career and "you can make more if you stay with them." He added that new hiring initiatives could highlight the positive influence individuals could have in a prison setting.

13.   Sen. Kearney thanked Sec. Little for help in de-privatizing a jail in Delaware County. He asked about how addiction impacts department costs. He noted the opioid epidemic is not slowing down. "As a state, we criminalize drug addiction, and many in jails and prisons are in need of addiction treatment," he said. Sen. Kearney noted that evidence-based treatment is best, specifically medically assisted treatment (MAT). Sec. Little said DOC has increased the use of MAT, particularly in women's prisons for pregnant inmates, and utilizes Vivitrol for reentry services. He said the department used grants and opioid funding for suboxone in the community. Sec. Little said MAT is also used for inmates in prison and parolees in the community. He stated DOC has also used grants for caseworkers to facilitate transitions into communities and they work to connect those individuals with community-based services. It's probably an area that we need to expand more in terms of tracking it into the community," he said. Sec. Little added that DOC may also be able to use opioid settlement funds that the state could receive.

Sen. Kearney detailed that drug addiction programs could also help lower recidivism rates. He asked how much the programs cost the department and if it uses federal funds. Sec. Little said funding for MAT uses federal grants and he will get a specific dollar amount to him. Sen. Kearney noted that it seems to be a good investment. Sec. Little agreed and noted that relapse and recidivism go hand-in-hand.

Sen. Kearney emphasized probation reform and explained that it would have a significant impact on DOC costs. Sec. Little agreed that it would have a positive impact. He noted there are different versions of the legislation and his department needs to further investigate those bills.

Sen. Kearney said the monitoring and check-ins involved in probation seem to be an obstacle to the successful completion of the program. Sec. Little reported that 95 percent of people in prison are returned to the community and many would need to successfully complete probation. Sec. Little explained that supervision of an individual should be at the lowest level needed and the introduction of requirements that are not involved in risk reduction is superfluous.

14.   Sen. Kearney inquired if there had been any lessons learned from the COVID-19 pandemic. Sec. Little explained that parole agents have gone mobile and are meeting their clientele where they are which allows them to have knowledge of their caseloads. He continued that video visitation for inmates has been "phenomenal," and allowed the population to share special moments with family members. Sec. Little also lauded the use of zoning concepts and cohorts, which was used in moving people into groups to reduce the spread of COVID-19. He said the system would probably go back to using large chow halls, although feeding in cells has been successful. Sec. Little also commented that "this may not be our last pandemic," and the department has learned how to quickly mobilize against infections.

Sen. Baker said Senate Bill 915 passed the Senate and is before House Judiciary Committee. She noted the bill could provide $7.2 million in savings and other savings to counties.

Sen. Pittman noted that in-person visitations are suspended until March 1. He expressed concern over a vaccination requirement for visitors. He noted that many people are hesitant to receive the vaccine. Sec. Little said he will entertain exemption requests, and added that DOC will hold vaccination clinics for those interested.

Sen. Pittman said visitations are important and would hate to see vaccination statuses be a barrier. He reported that inmate vaccination rates are high, and questioned if those numbers counted into Indiana County vaccination rates. Sec. Little said DOH would keep that information and he could relay that request to them.

15.   Sen. Street said Medicare expenditures and medical expenditures have gone up as the prison population ages. He explained that he is working on Senate Bill 835, which would create an ability for parole based on geriatric or infirmed status. He asked if it would be helpful in addressing cost issues. Sec. Little said the aging population is more expensive to manage and the legislation would have a positive impact. He explained that DOC would still want to make sure that those individuals receive care. He noted that the reason many people are in prison is that the social net failed them.

Sen. Street said he supports the $7 million investment to make sure that those people receive care. He stated that people who are elderly or infirmed have a lower risk to society and "if we can save some money, it makes sense." He asked if it is true that those individuals have a lower recidivism rate. Sec. Little confirmed.

Sen. Robinson inquired on the number of probation agents in the field. Johnson reported there are 655 field agents, 475 of those are caseload carrying agents, and 106 are specialized to handle intensive mental health cases.

Sen Robinson questioned the cost of housing someone in prison compared to those on parole. Sec. Little stated that it cost the department $9 per day to supervise an individual in the community and $163 to house them in prison.

3 of 9

Sen. Robinson expressed concern regarding the safety of parole agents. He inquired about the process of bringing a parolee back into the prison system. Sec. Little stated that agents are often able to get parolees to come into their office to be detained while other cases involve DOC working with state and federal law enforcement to return those individuals.

Sen. Robinson asked if parole agents have body cameras. Stephens said they do not have body cameras, but it would be a benefit if they utilized them. He was unaware of the cost to provide body cameras.

16. Sen. Stefano reported that institutional violence rates have decreased during the pandemic, but the secretary's testimony anticipates the rates to rise. He questioned the projection. Sec. Little explained the prisons were very constrained during the pandemic, which lowered the rates of violence. He stated that staffing decreases as the prisons begin to reopen will likely increase rates of violence.

Sen. Stefano commented the population of the prison in Somerset County is dropping below its capacity. Sec. Little said the population is around the correct COVID-19 capacity to allow for flexibility. "I think we're where we need to be right now," he said.

Sen. Stefano attributed some staffing vacancies to mandated overtime. Sec. Little said he has not seen trends and noted there are limits to overtime although they peaked during the recent COVID-19 surge. He stated that this is one of the reasons that in-person visitation was restricted and now that a number of staff members have returned from COVID-19 leave the prisons may return to normal operating standards.

17. Sen. Stefano commented on the death of a correctional officer who was killed several years ago and his death was attributed to the use of boots as weapons. Bickell stated that the Timberland boots were had already been banned at the time of the killing. He explained the department is issuing softer boots to inmates but is looking to contract with a company that can produce even softer boots.

Sen. Saval questioned the number of individuals who are incarcerated with chronic medical issues. Sec. Little reported that about 50 percent of inmates have chronic medical issues or are aging which for the department is any individual older than 50 years old.

Sen. Saval commented on the increasing nursing vacancy rate and asked for specific numbers. Oppman reported that there are usually 55 vacant nursing positions within the department, but there are now 115 vacancies. He stated that there have been some increases to the starting salary but the department has not yet reaped the benefits of the increase. He added DOC is working on recruitment initiatives within nursing schools and is looking to incorporate federal funds for further incentive.

Sen. Saval stated that he is working to introduce Fair Chance Housing legislation and asked if DOC would support the bill. Sec. Little reiterated the important role of safe housing in reentry and the department works to place parolees on with home plans as well as incentives for developers to include housing for those individuals. He stated an interest in reviewing the legislation.

18. Sen. Langerholc explained that the prison system recently had an issue with receiving contraband through the mail. He asked how the issue was addressed. Sec. Little explained that legal mail is kept separate and delivered directly to inmates but other types of mail are sent to the Department of General Services (DGS) where it is scanned and reprinted for delivery to inmates. He reported that DGS printed 7 million pieces of mail in 2021 and it has significantly limited the risk of drug-filled pages entering the facility.

Sen. Langerholc questioned how legal mail is verified. Sec. Little explained that attorneys are issued control numbers, but the department is working on new ways of testing for tinted mail.

Sen. Langerholc asked if inmates are sent fraudulent letters that appear to be from attorneys. Sec. Little explained that the use of coding eliminates that risk, however, a small number of attorneys have mailed pages at the request of others. He detailed that those attorneys are advised not to do so.

19. Sen. Langerholc expressed concern for the safety of correctional officers. He asked what steps are taken to ensure their safety. Sec. Little said some inmates who are at risk of violent behavior are moved to separate cells. He explained that those individuals are often moved into a step-down program rather than being placed directly into the general population.

20. Sen. Langerholc commented on the success of Quehanna Bootcamp.

Sen. Vogal inquired about the First Chance Act. Sec. Little said Pennsylvania is the first in the country to institute the program and it works to abate lead poisoning. He noted that children are at the greatest risk.

Sen. Vogal commented on the use of the Pennsylvania Preferred agriculture program being used in the prison system. He asked if there had been an issue in getting produce and other products. Sec. Little explained the program is working well although there are some supply chain issues. Oppman said prisons are working to maintain proper inventories and spend $10 million on locally-sourced food.

Sen. Vogal noted that the number of women in prison decreased but the budget includes more funding for their medical costs. He questioned the matter. Sec. Little remarked that the population has gone down but more the population is in high need due to trauma and substance abuse issues.

21. Sen. Flynn inquired on the correctional officer to inmate ratio. Sec. Little stated it is 1 to 4.1.

Sen. Flynn explained that parole agents have complained that they are not paid at the same rates as correctional officers. He asked if there would be equality in the rates. Sec. Little said he is working with the Wolf administration to move parole staff to a similar pay scale.

Sen. Flynn reported that parole officers, on average, have 57 cases. He asked if the ratio was lower before the pandemic. Sec. Little reported the ratio of agent to parolee was previously 54 to 1.

22. Sen. Phillips-Hill explained DOC recently contracted with Recidiviz. She inquired about the purpose of the contract. Sec. Little said the contract grew out of agreement with the Council of State Governments (CSG) to improve supervision practices for better outcomes of reentry and better use of databases for management. He explained the company provides a dashboard of data for everyone to measure recidivism.

Sen. Phillips-Hill questioned if the contract was awarded competitively. Sec. Little said it was paid for using a grant from CSG and is not subject to competitive bidding, however, the department is looking to contract a company to maintain the dashboard, he said.

Sen. Phillips-Hill questioned the need to pay for a third party to repackage data when DOC is already collecting the data. Sec. Little said Revidiviz does more than repackaging to create a dashboard and allow for the dissection of data at multiple levels.

Sen Phillips-Hill inquired if DOC consulted with the Office of Administration or the chief informational technologist. Sec. Little said he was not the acting secretary at that time and would need to verify.

Sen. Phillips-Hill asked what efforts are present to protect incarcerated women from being victims of human trafficking after being released from prison. Sec. Little explained the department is working on "several fronts," from working with the inmate population to educate them as well as with law enforcement to identify known traffickers.

23. Sen. Baker questioned if the closure of SCI Retreat saved $20 million as projected. Sec. Little said it did, however, there are some maintenance costs. He commented that some local governments are interested in purchasing the location for other uses.

Sen. Baker said Luzerne County looked at the location two years ago but did not think it was a good investment. She asked if DOC had determined a purchase price. Sec. Little said he did not have a purchase price.

Sen. Baker asked if DOC had realized $5.2 million in savings from the consolidation of probation and DOC. Sec. Little said the department has saved that amount.

24. Sen. Baker commented on the homicide review team. She inquired about the number of murders committed by reentrants. Sec. Little said 57 people were killed by reentrants, which is a decrease from last year. Sen. Baker questioned if there is a need for statutory changes. Johnson said he and the board reviewed the cases and altered the standard for parole. He commented that there is one vacancy on the board and there will be a second vacancy in June. He encouraged the legislature to appoint members to the board.

Sen. Baker questioned how victims and their families are affected in the parole process. Johnson explained that the victim interview is crucial and the board allows any victim to have a face-to-face interaction with their perpetrator. He commented that some interviews are conducted virtually which helps the victim bring up trauma from the past.

Sen. Santarsiero explained that Bucks County commissioners have reported that they have not been reimbursed for services they provided to inmates. He questioned if the county should expect a reimbursement. Sec. Little said he was unfamiliar with the situation and was surprised the inmates were kept in county prison for a longer period of time. He said he would need to address the statutory requirements before paying for services.

25. Sen. Santarsiero questioned the emergency reprieve program during COVID-19 and inquired on the impact of the policy. Sec. Little explained that many of those who entered the reprieve program had short sentences. He detailed 97 inmates had their sentences commuted while others were placed on administrative parole.

Chairman Browne thanked the testifiers for their participation and for working through "extraordinary circumstances." He stated that members of the commonwealth owe a debt of gratitude to DOC and PBPP. He explained that COVID-19 presented challenges, but it allowed for opportunities to change. "We are trying to get a handle for what it means for administrative capacity going forward," he

# EXHIBIT D

*11.2.1, Reception and Classification Procedures Manual*
*Section 5 – Single-Celling (Z-Code) and Double-Celling Housing*

## Section 5 – Single-Celling (Z-Code) and Double-Celling Housing

### A. General Procedures/Orientation

1. During the diagnostic and classification process and upon reception at any facility as a result of a transfer, each inmate shall be interviewed and available records shall be reviewed by the Initial Reception Committee (IRC), after which the appropriate housing status shall be determined. Staff shall inform inmates of the conditions which apply to double-celling. During this orientation, staff shall explain rules governing behavior as well as those governing the conditions and contents of the cell. Included shall be procedures for requesting consideration for termination of double-celling *as well as the following*:

   a. instructions for inmates to follow to inform staff of any problems arising as a result of double-celling; and

   b. *it shall be discussed that every attempt shall be made to ensure that inmates that do not have a Z-Code are assigned to a double cell with a cellmate (i.e., inmates shall not be celled in a single cell out of convenience).*

2. *If Unit Management staff or Security staff have the need to place an inmate (i.e., who does NOT have a Z-Code) into a cell without a cellmate in an emergency situation or due to temporary operational need, this may occur. However, when appropriate and when situations permit, prior to placing any inmate into a cell alone, the Unit Management staff shall follow the review process outlined in Subsection B.2.a.-f. below.*

3. *Security staff shall be aware of inmates on their block that have a Z-Code or are housed alone without a cellmate so that security rounds are informed of an increased risk associated with these individuals.*

### B. Processing Inmates for Double-Celling

An inmate who does not require single-cell status (Z-Code) *shall* be processed for double-celling according to the following guidelines and procedures.

1. Selection of cells: Selection of cells to be used for double occupancy should be made pursuant to the following guidelines:

   a. cells in administrative custody (AC) or disciplinary custody (DC) may be used for double occupancy only after careful review of those inmates to be double-celled; and

   b. every attempt should be made to designate cells in locations that afford the most appropriate access, supervision, and control.

Issued: 11/1/2021
Effective: 11/8/2021

*11.2.1, Reception and Classification Procedures Manual*
*Section 5 – Single-Celling (Z-Code) and Double-Celling Housing*

2. Selection criteria governing inmates to be double-celled are listed below.

a. *Every attempt shall be made to ensure that inmates that do not have a Z-Code are assigned to a double cell with a cellmate when this can be accomplished safely. Inmates shall not be placed in a cell by themselves out of convenience. Staff shall first search for a compatible cellmate within the block. Should those efforts fail, staff shall consider cellmates within the same facility zone. Should those efforts fail, staff shall consider cellmates anywhere within the facility. Inter-block communication is essential among Unit Management staff to ensure that all inmates that do not have a Z-Code are housed in a double cell with a cellmate, unless specified by a specific or temporary institutional need.*

b. Double-celling of inmates generally shall be based on the inmate's expression of preferences affecting double-celling compatibility. An inmate's request generally shall be accommodated if circumstances permit and provided there are no contraindications (custody level, security needs, etc.) noted by staff. If the inmate does not express a preference, the double-cell assignment shall be made based on facility need (available bed space).

c. During the inmate reception process, the IRC or designated responsible staff shall ask the inmate if he/she has preferences affecting double-celling compatibility, but shall not offer the inmate choices. If the inmate indicates a preference (familial relationships, age, race, etc.), this information shall be documented and forwarded to the inmate's Counselor for inclusion in the **DC-14, Cumulative Adjustment Record** for future reference. To the extent reasonable, the inmate's indicated preferences should be accommodated. When it is not reasonable to accommodate, staff should inform the inmate whether the preference is likely to be accommodated in the future and, if so, when such an accommodation is likely to occur. The facility does not have to move an inmate based solely on his/her request.

d. *In addition to interviewing both inmates*, the Unit Management staff shall review *both of* the inmates' records to determine whether there is an imbalance of power between the inmates that could lead to victimization of the weaker inmate. *(28 C.F.R. §115.42[b])* This review shall include, *but is not limited to, the following*:

(1) misconducts, *prior institutional violence, prior institutional sexual abuse, and prior convictions for violent offenses*; *(28 C.F.R. §115.41[e])*

(2) an inordinate number of cell partners for either inmate;

(3) *a comparison of both inmates' ages in an effort to cell inmates safely together with inmates that are of similar age*;

(4) *a comparison of physical size to avoid disparity*;

5-2

Case 2:22-cv-01325-PD   Document 28   Filed 07/01/22   Page 36 of 74

*11.2.1, Reception and Classification Procedures Manual*
*Section 5 – Single-Celling (Z-Code) and Double-Celling Housing*

(5) *medical issues*;

(6) *geographic/regional differences*;

(7) Prison Rape Elimination Act (PREA) Risk Assessment Tool (PRAT) *score compatibility* as outlined in Department policy **DC-ADM 008, "PREA;" (28 C.F.R. §115.42[b])**

(8) *an evaluation* for "Housing Concerns" (Potential Sexual Assault Victim and/or Institutional Sexual Predator). Any identified Housing Concerns must be recorded in DOCInfo by clicking on the appropriate box on the "Security Concerns" screen of the Unit Management System and entering the reason for this designation in the Comments box; and

(9) *other security needs such as gang affiliation and custody level, and/or a documented history of racial violence or the propensity for such*; or any other information that may suggest a potential for one inmate assaulting the other.

e. The Department shall not assign housing based solely on race. Where an inmate states a preference for double-celling on race, that preference should be considered.

f. *Involuntary double-celling should be a last resort when appropriate; however, the Unit Manager or Officer-in-Charge shall make every effort to facilitate a voluntary double-celling agreement between the inmates when this can be accomplished safely. When it is necessary to involuntarily double-cell inmates on the unit:*

(1) *consider all factors outlined in the Subsection B.2. above to include both risk factors to double-celling as well as the inmate's preferences;*

(2) *the Involuntary Double-Celling Checklist (refer to Department policy 6.5.1, "Administration of Security Level 5 Housing Units," Section 1) shall be used prior to double-celling an inmate who does not agree to voluntary double-celling. Any "yes" response in the Staff Review section of the checklist requires review by the Officer-in-Charge;*

(3) *if an inmate is on the active Mental Health/Intellectual Disability (MH/ID) Roster, staff shall seek Psychology input; and*

(4) *if no concerns/preferences are expressed, and no documented compatibility contraindications are present when making an involuntary double-celling assignment, this shall be documented on the Involuntary Double-Celling Checklist and the DC-17X, Adjustment Record for Security Level 5 Inmates and the double-celling assignment will be made based upon available bed space.*

Issued: 11/1/2021
Effective: 11/8/2021

*11.2.1, Reception and Classification Procedures Manual*
*Section 5 – Single-Celling (Z-Code) and Double-Celling Housing*

## C. Evaluating and Processing Inmates for Single Cell Status (Z-Code)[1]

1. Any inmate who meets any of the following criteria shall be carefully reviewed by staff and considered for Z-Code housing classification. *Staff must be aware that there are factors which may contraindicate Z-Code assignment or continuation as well as the housing of an inmate alone in a cell (i.e., without a cellmate).*

    a. *Z-Codes shall not be assigned for reasons only related to general mental health concerns or mental illnesses. However, inmates with a history of mental illness or current mental illness may be considered, but the inmate must also meet additional Z-Code criteria as outlined below to be approved for a Z-Code.*

    b. An inmate with certain medical conditions (an infectious disease, colostomy, etc.), indicating a possible need for a single cell.

    c. An inmate who staff believe may be victimized as a result of double-celling, multiple celling, or placement in a dormitory.

    d. An inmate who has a documented history of aggressive or predatory behavior towards cell partners or who staff have reason to believe would exhibit assaultive or predatory behavior towards cell partners.

    e. *Inmates identifying as opposite genders shall not be celled together unless a determination is made through the facility PREA Accommodation Committee that doing so would not put either cellmate in a vulnerable position.*

2. A newly received inmate at a Diagnostic and Classification Center (DCC) may be assigned a temporary Z-Code until transferred to a permanently assigned institution. When an inmate is transferred from one facility to another, the sending facility shall explain the specific reason for Z-Code in the transfer rationale. The IRC at the receiving facility shall review the Z-Code housing classification to determine if it is still appropriate for the inmate. If the IRC determines that a Z-Code should remain, it should be processed according to the procedures in **Subsection C.7. below**.

3. When reviewing an inmate for Z-Code housing status, facility staff shall complete a review of appropriate documentation. Documentation shall include misconduct reports, recommendations from medical and/or psychiatric or psychological staff, and reports from other staff who have knowledge of the inmate's adjustment and behavior. The Program Review Committee (PRC), Unit Manager, or Shift Commander may temporarily assign a Z-Code until a full assessment is completed.

4. *When reviewing an inmate for a Z-Code, facility Psychology staff shall be contacted to complete a Z-Code assessment for the Unit Management staff and DC-46, Vote Sheet process. A request for Z-Code will be made by the Counselor to Psychology via the DC-97, Mental Health Referral form. The reason for the Z-Code*

---

[1] 5-ACI-2C-02

Issued: 11/1/2021
Effective: 11/8/2021

request/renewal will be thoroughly documented on the DC-97. It is the responsibility of the Counselor to inform Psychology of the need for a Z-Code assessment the month prior to the annual review, to ensure the assessment is available for the review.

5. The individual Psychology staff member conducting the Z-Code assessment should not be the assigned treating Psychology staff member; if it is, this issue should be identified in the body of the documented assessment. Additionally, the Psychology staff member who conducted the assessment should also be present at the staffing and vote on the DC-46. Psychology's vote on the DC-46 is not a unilateral decision. The Unit Management Team members should independently vote on the DC-46 and refrain from "Per Psychology" voting rationale.

6. The purpose of the Z-Code assessment is to gather, compare, and weigh information related to the inmate's Suicide Risk, likelihood of dangerousness to a cell partner, and other issues which may support or contraindicate a Z-Code, to make an informed and reasonable recommendation from a Psychological perspective. Psychology staff will document the Z-Code assessment within the Electronic Health Record using the Special Psychological Assessment form. Once signed off by a Licensed Psychologist, the assessment will be provided to the Counselor via secure encrypted email. At the conclusion of this report, Psychology will provide a recommendation either for or against a Z-Code at the current time, within the body of the Special Psychological Assessment form, given the consideration of all information collected and synthesized.

The clinical assessment from Psychology shall entail the following minimum elements to inform Psychology's recommendation:

a. Suicide Risk Assessment (SRA)

Completion and documentation of a thorough SRA, which includes a Mental Status Exam, identification or review, and updating of Chronic and Acute Risk factors of suicide as well as Protective Factors against suicide. Additionally, the SRA will include the completion of a Safety Plan for the inmate, as well as a plan completed by the Psychology staff member which reflects the level of suicide risk presented by the inmate.

b. Assessment of Dangerousness towards Cell Partner

(1) A clinical interview to identify and assess static and dynamic factors of dangerousness or violence towards cell partners, which may contraindicate double-celling. Areas to address in this interview may include, but are not limited to, a brief historical overview of violence towards cell partners as well as a summary of the inmate's irritability, impulsivity, anger management, negative attitudes, or verbal threats towards cell partners. This interview should also, if necessary, address other reasons and areas of concern related to why a Z-Code may or may

not be indicated.

(2) *Review and contextualization of available objective psychological testing to assist with assessment of dangerousness. This review may include the Violence Potential Index (VPI) and Aggression Scale (AGG) and subscales (i.e., Aggressive Attitude, Verbal Aggression, and Physical Aggression) from the Personality Assessment Inventory (PAI) or any other relevant scales from the PAI or other relevant objective psychometric tool that has been administered in the past 24 months. Objective testing referenced in the Z-Code assessment should only include test results that are 24 months old or less. If the only available objective testing results are older than 24 months from the date of the current assessment, objective testing results will NOT be referenced. However, if objective psychological testing is not available or is not 24 months old or less and the Psychology staff member completing the assessment believes that objective psychological testing would be beneficial to the assessment process, the Psychology staff member may administer objective psychological testing, under the clinical supervision of his/her clinical supervisor, to better inform the assessment.*

(3) *Review of available records should be included to assist with determining dangerousness towards cell partner and other issues relevant to the determination of whether a Z-Code is indicated. It is necessary for the assessment to also contextualize the nature, frequency, and recency of behaviors or incidents identified within the records review or discussed in the clinical interview. The records review may include, but is not limited to the following:*

(a) *history of violence/sexual violence and history of violence/sexual violence toward cellmate;*

(b) *history of weapon possession while incarcerated;*

(c) *history of violent misconducts including threats of violence;*

(d) *history of property destruction misconducts;*

(e) *history of refusing to an obey order misconducts;*

(f) *gang membership;*

(g) *history of nonadherence to medication which results in violent behavior; and*

(h) *other factors as appropriate.*

Issued: 11/1/2021
Effective: 11/8/2021

    c. *Other Issues which may Support or Contraindicate a Z-Code*

      *Input from multiple staff sources of information may include, but is not limited to housing unit officers, work supervisor, facility PREA Compliance Manager (PCM), treating Psychology staff member, Unit Manager, Unit Counselor, or Medical staff, if indicated.*

7. The assignment or continuation of all Z-Codes requires review and approval by the Regional Deputy Secretary (RDS).

    a. After review of the Z-Code recommendation and supporting documentation by IRC or the Unit Management Team, a **DC-46,** along with other relevant information shall be circulated to the Facility Manager/designee for a decision.

    b. If approved, the Facility Manager/designee shall provide a copy of the written rationale, the **DC-46,** current recommendations from Medical and/or Psychiatric staff, the Security Office, or any other supporting documentation, along with the **Z-Code Approval/Continuation Request Form (Attachment 5-A)** to his/her respective RDS and inspection team by emailing: **CR-DOC Eastern Region Inspection Team; CR-DOC Central Region Inspection Team; or CR-DOC Western Region Inspection Team.** If the Facility Manager disapproves the addition/continuation of the Z-Code, there is no need to submit an approval packet to the RDS.

    c. *The RDS shall consult with the Director of Psychology in reviewing Z-Codes as needed.* The RDS's *final* decision will be forwarded to the Facility Manager. If approved, the Facility Manager will direct the Unit Management Team to update the inmate's program code in the Unit Management System under the "Program Code" section, note in the Inmate Cumulative Adjustment Record (ICAR), and in the Pennsylvania Additive Classification Tool (PACT). The update shall include the date of approval and brief rationale for adding/continuing Z-Code.

    d. At a minimum, the review of existing Z-Codes shall be conducted during the annual review.

    e. The assignment of temporary Z-Codes is not subject to review by the RDS. All Z-Codes assigned longer than six continuous months shall not be considered temporary and must be reviewed by the RDS. Assignment or removal of temporary Z-Codes may not require a **DC-46;** however, rationale for the assignment or removal of the temporary code is required to be documented in the ICAR.

    f. Removal of the Z-Code does not require review by the RDS. However, the removal of a Z-Code will require the Facility Manager's approval via the **DC-46** Vote Sheet procedures.

Issued: 11/1/2021
Effective: 11/8/2021

8. Use of Z-Code

   a. Z-Code housing status can be assigned to an inmate any time during an inmate's incarceration.

   b. In addition to staff-initiated housing evaluations, an inmate may request to be reviewed for the addition or deletion of Z-Code housing classification. Staff shall make the final determination regarding Z-Code addition or removal according to procedures in **Subsection C.7. above**. Unless there is an obvious demonstrated need, this will be completed at the inmate's regularly scheduled annual review. If the inmate meets the criteria for consideration of a single cell, the Counselor shall follow procedures outlined in **Subsection C.7. above**. If the inmate does not meet the criteria, the Counselor shall inform the inmate of his/her ineligibility and document the specific reason why in the ICAR.

   c. An inmate assigned Z-Code due to an inability to double cell, is not necessarily precluded from open dormitory housing if staff believe the inmate or others will not be jeopardized as the result of the dormitory housing placement.

   d. The Z-Code housing status is not necessarily a permanent status. An inmate who is classified with a Z-Code shall be reviewed at least annually and at any other staffing to insure the code is still the most appropriate housing classification. *Inmates on the active mental health roster that have a Z-Code, shall have the Z-Code reviewed for appropriateness at every subsequent Psychiatric Review Team (PRT) scheduled for that inmate. A DC-563, Psychiatric Review Team Summary from a Psychology staff member shall memorialize the PRT's rationale and decision to support or deny the continuation of a Z-Code for any inmates on the active mental health roster. If PRT determines that a Z-Code is contraindicated, that decision and rationale shall be provided to the respective Unit Manager and Counselor for appropriate review. A Special Psychological Assessment, as outlined above, shall be completed for each annual review of Z-Code, as well as for Psychology's initial Z-Code assessments. Neither this assessment nor a formal staffing is required for interim PRTs unless the PRT results in a recommendation to remove the Z-Code.*

   e. An inmate assigned Z-Code due to assaultive tendencies towards cell partners or who staff have reason to believe would be assaultive toward cell partners:

      (1) shall be Custody Level 4 or greater as determined by the PACT in accordance with **Section 3** of this procedures manual. Staff shall make a notation in the "Security Concerns" section of the Unit Management System, specifying the type of assaultive behavior (e.g., physical/sexual);

      (2) who is identified as a Facility Sexual Predator must be assigned Custody Level 4 or 5 and Program Codes "Z" and "H";

5-8

    (3)   may be assigned Custody Level 3 in certain cases based upon recommendation by facility staff (via established **DC-46** process) to encourage the inmate's prolonged positive adjustment as an incentive for continued compliant conduct, i.e., when he/she is aware that staff will support cooperation and progress; and/or

    (4)   may have the Z-Code removed only if he/she can demonstrate to staff that he/she no longer poses a threat to the cell partner(s), and that the code is no longer needed.

9. ***Z-Codes and those Inmates Housed Alone in a Restrictive Housing or Specialized Management Housing Unit***

   *Any inmate that is housed in a cell alone (i.e., with Z-Code or without a Z-Code and no cellmate assigned) within any Restrictive Housing or Specialized Management Housing Unit will be observed more closely by Security staff. Security staff shall be aware of inmates on their block that have a Z-Code or are housed alone without a cellmate so that security rounds are attentive to the increased risk these individuals may present.*

Issued: 11/1/2021
Effective: 11/8/2021

# EXHIBIT E



**BULLETIN**
**Commonwealth of Pennsylvania • Department of Corrections**

| Policy Subject: | Access to Health Care Procedures Manual<br>Section 8 -- Communicable Diseases and Infection Control | |
|---|---|---|
| Policy Number: | 13.2.1, Section 8-01 | |
| Original Issue Date: | July 8, 2011 | |
| Date of Issue:<br><br>January 6, 2015 | Authority:<br><br>Signature on File<br><br>John E. Wetzel | Effective Date:<br><br>January 6, 2015 |

The purpose of this bulletin is to add procedures for the handling of potential Ebola Virus Disease cases at the facility level.

A new subsection shall be included under **Subsection H. Infection Control** in between 7. Simple Protective Isolation and 8. Specimen Collection. The new section shall read:

8.  Ebola Procedures

a.  The current Ebola Virus Disease (EVD) epidemic in West Africa, and its threat of spreading to the United States, are being closely monitored nationally by the Centers for Disease Control and Prevention (CDC). The overall Department objective is to protect our facilities from the EVD entering. If it does enter, the Department will safely transport those inmates who have contracted the disease to an outside medical facility as expeditiously as possible. The Department of Health (DOH) will be notified and assist in identifying contacts and providing appropriate follow-up.

b.  The Ebola Virus was first identified in Africa in 1976. It originated in bats and first spread to monkeys, before being contracted by humans. The killing and eating of this "bushmeat" is still one of the sources of infection. Since then, there have been 25 outbreaks, each one resulting in the deaths of hundreds of Africans. In 2014, the virus reappeared in an area shared by the borders of three West African countries: Guinea, Sierra Leone, and Liberia. This virus is no more deadly than the others; however, it resulted in the deaths of thousands of Africans this time. The reason is that the culture is different. There is much more travel within this area than in others. Also, there are cultural barriers to isolating sick patients and burying the dead in a safe manner.

**Sexually Abused Inmate**

## A. Signs and Symptoms

Reluctance to be touched; difficulty in setting boundaries with others; difficulty in trusting people; depression; fear/paranoia; self-inflicted injuries.

## B. Nursing Measures

1. refer to Department policy **DC-ADM 008, "Sexual Harassment and Sexual Abuse of Inmates,"** regarding reporting and documentation responsibilities;

2. nursing staff shall note date, time, and location that the incident occurred and what happened. Documentation shall consist of facts and **not** speculation;

3. the Shift Commander shall be notified of the alleged incident. The inmate is not to be left unattended;

4. have inmate sent to the emergency room for verification and initial treatment;

5. the physician shall examine the inmate and provide any follow-up treatment;

6. document Subjective Objective Assessment Plan (SOAP) note; and

7. follow-up as necessary

    e.   All medication(s) shall be packaged and sent in a secure manner.

    f.   The nursing staff at the receiving facility shall return the self-medication(s) to the inmate, if appropriate.

6. Reasonable Accommodations

    a.  In accordance with Department policy **DC-ADM 006, "Reasonable Accommodations for Inmates with Disabilities,"** an inmate requiring DOT shall be granted reasonable accommodations with regard to maintaining his/her medication schedules.

    b.  Medical clearance for employment or programs shall not be affected by the DOT requirement (outside workers, Community Work Programs [CWP], etc.).

Issued: 8/25/2014
Effective: 9/22/2014

### 13.2.1, Access to Health Care Procedures Manual
### Glossary

7. all controlled substances;

8. all non-steroidal medications;

9. all muscle relaxants;

10. all cold/flu protocols;

11. all decreasing dose steroids;

12. all anti-opportunistic medications associated with HIV;

13. all medications prescribed to an inmate who cannot or will not take the medication by himself/herself;

14. all refrigerated medications; and

15. all medications ordered to be dispensed by way of DOT.

**Direct Observation Therapy Patients**

1. any inmate who received at least one DOT medication;

2. any inmate assigned to the psychiatric review/mental health roster;

3. any inmate who, for whatever reasons, is incapable of self-administering medication; and

4. any inmate who refuses to participate in or comply with prescribed self-medication.

**Direct Supervision**

For this procedures manual, it is the supervision by a dentist who examines the patient, authorizes the procedure to be performed, is physically present in the dental facility and available during the performance of the procedure, and examines and takes full responsibility for the completed procedure. (From the 49 Pa. Code §33.)

**Directly Observed Preventive Therapy (DOPT)**

Directly Observed Preventive Therapy is the same as DOT, except that it is for prophylactic medication.

**Directly Observed Therapy (DOT)**

Is the assurance that the inmate takes each indicated dose of medication to treat tuberculosis disease; this includes assuring his/her presence, watching the inmate swallow each dose and documenting the encounter.

x

# EXHIBIT F

03/11/2021  (25)



**POLICY STATEMENT**
**Commonwealth of Pennsylvania • Department of Corrections**

| Policy Subject: | Policy Number: |
|---|---|
| Reasonable Accommodations for Inmates with Disabilities | DC-ADM 006 |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| January 2, 2009 | Signature on File | January 23, 2009 |
| | Jeffrey A. Beard, Ph.D. | |

## I.  AUTHORITY

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, 71 P.S. §§61, 66, 186, and 310-1, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II.  APPLICABILITY

This policy is applicable to all facilities operated under the jurisdiction of, or conducting business with the Department of Corrections.

## III.  POLICY

It is the policy of the Department to establish procedures for an inmate to request an accommodation for a qualified disability that affects a major life activity and to ensure that:

A. every inmate, including an inmate with a qualified disability, is housed in a manner that provides for his/her safety and security;

B. reasonable accommodations are made only if the accommodations pose no direct threat to the individual requesting the accommodation or cause an undue hardship on the Department;

C.  reasonable accommodations are made to the physical structure of housing used by an inmate with a qualified disability to accommodate the physical limitations of the disabled inmate and facilitate the inmate's inclusion in facility life;[1]

D.  a Unit Manager may authorize housing unit furnishings within the cell/dorm to be rearranged to best accommodate an inmate with a qualified disability. A visually impaired inmate shall be given bottom bunk status;

E.  reasonable accommodations are made to facility programs and activities to permit participation by a qualified inmate with a disability; and

F.  no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of the Department.[2]

## IV.  PROCEDURES

All applicable procedures are contained in the procedures manual that accompanies this policy document.

## V.  SUSPENSION DURING AN EMERGENCY

In an emergency or extended disruption of normal facility operation, the Secretary/designee may suspend any provision or section of this policy for a specific period.

## VI.  RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual.  This policy should be interpreted to have sufficient flexibility to be consistent with law and to permit the accomplishment of the purpose(s) of the policies of the Department of Corrections.

## VII.  RELEASE OF INFORMATION AND DISSEMINATION OF POLICY

### A.  Release of Information

1.  Policy

    This policy document is public information and may be released upon request.

2.  Confidential Procedures (if applicable)

    Confidential procedures for this document, if any, are <u>not public information</u> and may not be released in its entirety or in part, without the approval of the Secretary of

---

[1] 4-4142
[2] 4-4277, 4-4429

Corrections/designee. Confidential procedures may be released to any Department of Corrections employee on an as needed basis.

**B. Distribution of Policy**

1. General Distribution

   The Department of Corrections' policy and procedures shall be distributed to the members of the Central Office Executive Staff, all Facility Managers, and Community Corrections Regional Directors on a routine basis.  Distribution of confidential procedures to other individuals and/or agencies is subject to the approval of the Secretary of Corrections/designee.

2. Distribution to Staff

   It is the responsibility of those individuals receiving policies and procedures, as indicated in the "General Distribution" section above, to ensure that each employee expected or required to perform the necessary procedures/duties is issued a copy of the policy and procedures either in hard copy or via email, whichever is most appropriate.

## VIII. SUPERSEDED POLICY AND CROSS REFERENCE

**A. Superseded Policy**

1. Department Policy

   DC-ADM 006, Reasonable Accommodations for Inmates with Disabilities, issued March 26, 2004, by Secretary Jeffrey A. Beard, Ph.D.

2. Facility Policy and Procedures

   This document supersedes all facility policy and procedures on this subject.

**B. Cross Reference(s)**

1. Administrative Manuals

   a. DC-ADM 804, Inmate Grievance System

   b. DC-ADM 816, Inmate Compensation System

   c. 5.1.1, Staff Development and Training

2. ACA Standards

   a. Administration of Correctional Agencies: 2-CO-4E-01

b. Adult Correctional Institutions: 4-4142, 4-4277, 4-4285, 4-4286, 4-4348, 4-4362, 4-4363, 4-4365, 4-4366, 4-4375, 4-4429, 4-4450

c. Adult Community Residential Services: 4-ACRS-1A-09, 4-ACRS-4C-06, 4-ACRS-4C-23, 4-ACRS-6A-04, 4-ACRS-6A-11, 4-ACRS-6B-01, 4-ACRS-7A-05

d. Correctional Training Academies: None



**PROCEDURES MANUAL**
**Commonwealth of Pennsylvania • Department of Corrections**

| Policy Subject: | Policy Number: |
|---|---|
| **Reasonable Accommodations for Inmates with Disabilities** | **DC-ADM 006** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| **January 2, 2009** | **Signature on File** <br> **Jeffrey A. Beard, Ph.D.** | **January 23, 2009** |

Release of Information:

**Policy Document:** This policy document is public information and may be released upon request.

**Procedures Manual:** The procedures manual for this policy may be released in its entirety or in part, with the prior approval of the Secretary/designee. Unless prior approval of the Secretary/designee has been obtained, this manual or parts thereof may be released to any Department employee on an as needed basis only.

*DC-ADM 006, Reasonable Accommodations for Inmates with Disabilities Manual*
*Table of Contents*

## Section 1 – General Procedures

A. Classification/Diagnosis ................................................................................. 1-1
B. Facility Placement ......................................................................................... 1-1
C. Inmate Work Programs ................................................................................. 1-2
D. Staff Training................................................................................................. 1-2

## Section 2 – Accommodations

A. Request for Accommodation .......................................................................... 2-1
B. Review of the Inmate Disability Accommodation Request Form ..................... 2-1
C. General Accommodations............................................................................... 2-2
D. Program/Services Accommodations ............................................................... 2-3

## Section 3 – Specific Disabilities

A. Local Procedures ........................................................................................... 3-1
B. Accommodations for the Deaf and Hard of Hearing ....................................... 3-1
C. Accommodations for the Visually Impaired .................................................... 3-1
D. Accommodations for the Mentally and/or Physically Impaired ........................ 3-1

*DC-ADM 006, Reasonable Accommodations for Inmates with Disabilities Manual*
*Section 1 – General Procedures*

## Section 1 – General Procedures

### A. Classification/Diagnosis

1. Qualified health-care personnel shall perform a medical, dental, and mental health screening/appraisal of each inmate, including intra-system transfers, within 14 days of the inmate's initial commitment. Only qualified health care professionals shall determine whether an inmate should retain any prosthetic device or equipment upon initial reception.

2. The facility's health care department, through qualified personnel or specialists, and in conjunction with the affected inmate, shall make the diagnosis of a qualified disability, unless previously diagnosed, and shall determine the level of accommodation needed and provide the appropriate medical treatment, as required by the condition. Medical staff shall notify facility staff of any impairment.

3. In determining the type of auxiliary aid and/or service necessary, consideration should be given to the requests of the inmate with the disability, **but the inmate's request is not determinative**. This information shall be recorded in the inmate's medical file. The inmate's **DC-17X, Adjustment Record** should reflect this same information.

4. Upon the request of the inmate. A notation shall be placed on the inmate's I.D. card that he/she has a qualified disability to alert staff that accommodations may be needed to properly communicate.

### B. Facility Placement[1]

1. In addition to all other factors considered by the Department in making facility assignments of an inmate, consideration may be given to facilities and programming available at various facilities to accommodate an inmate's particular qualified disability(s)[2] in accordance with **Facilities Designated to House Qualified Disabled Inmates (Attachment 1-A)**. An inmate diagnosed with a qualified disability may be assigned to a facility where accommodations exist to provide for this population. An inmate diagnosed as mentally and/or physically impaired may be assigned to a Special Needs Unit, depending on the severity of the disability, and may be assigned to a facility with a Mental Health Unit or a facility where accommodations exist to provide for this population.

2. Community Corrections Center (CCC) Placement

   In addition to all other factors considered by the Department in making assignments of an inmate for CCC placement, an inmate with a qualified disability who is accepted for CCC placement shall be placed in a CCC or Community Contract Facility (CCF) that provides accommodations according to the individual needs of the inmate.

---

[1] 4-4348
[2] 4-ACRS-6A-04, 4-ACRS-6A-11

**DC-ADM 006, Reasonable Accommodations for Inmates with Disabilities Manual**
**Section 1 – General Procedures**

3. Transfers

   Material submitted requesting the transfer of a qualified disabled inmate to another facility must clearly indicate that the inmate has a qualified disability and include the level of accommodation and resulting services that are required.

## C. Inmate Work Programs

1. No inmate shall be discriminated against from participating in work programs due to a qualified disability. The Department is required to make reasonable accommodations to the known disability of qualified inmate applicants with disabilities. Compensation and job titles shall be in accordance with Department policy **DC-ADM 816, "Inmate Compensation System."**[3]

2. Accommodations that pose undue hardships for the Department or pose a threat to security need not be provided. An inmate will not be placed in a work program, which clearly jeopardizes his/her safety or security.

## D. Staff Training

Housing Unit Staff who have primary supervisory responsibility for an affected inmate may obtain out-service training to learn methods of communicating with the inmate and/or managing his/her specific disability in accordance with Department policy **5.1.1, "Staff Development and Training."**

---

[3] 4-4450

**Facilities Designated to Housed Qualified Disabled Inmates**

1. Every qualified deaf and hard of hearing male affected by this policy shall be housed at one of the following facilities:

   a. SCI-Albion;

   b. SCI-Camp Hill;

   c. SCI-Graterford.

2. Every qualified deaf and hard of hearing female affected by this policy shall be housed at SCI-Muncy.

3. Every qualified mentally and/or physically disabled male inmate affected by this policy shall be housed at one of the following facilities:

   a. SCI-Albion;

   b. SCI-Coal Township;

   c. SCI-Somerset;

   d. SCI-Mahanoy;

   e. SCI-Houtzdale;

   f. SCI-Laurel Highlands; or

   g. any facility with a Mental Health Unit (MHU), Special Needs Unit (SNU), or any other appropriately equipped facility.

4. Every qualified mentally and/or physically disabled female inmate affected by this policy shall be housed at SCI-Muncy or SCI-Cambridge Springs.

5. Every qualified vision impaired male and female inmate affected by this policy shall be housed at a facility designated as the most appropriate to handle the vision impairment based on the severity of the disability.

6. Each disabled Young Adult Offender (YAO) shall be housed at SCI Pine Grove.

7. Wheelchair bound inmates shall be housed at a prototypical facility or any other appropriately equipped facility.

*DC-ADM 006, Reasonable Accommodations for Inmates with Disabilities Procedures Manual*
*Section 2 – Accommodations*

## Section 2 – Accommodations

### A. Request for Accommodation

1. An inmate seeking an accommodation for a disability shall submit to the Corrections Health Care Administrator (CHCA) or to the person performing the functions of the CHCA if the facility does not have a CHCA, a request using the **Inmate Disability Accommodation Request Form (Attachment 2-A)**.

2. The **Inmate Disability Accommodation Request Form** must describe the inmate's specific disability(ies), the specific activity(ies), and the specific action the inmate wishes the Department to take to allow him/her to perform the activities.

3. Any observing staff member can make a request for accommodation on behalf of an inmate.

### B. Review of the Inmate Disability Accommodation Request Form

1. The CHCA/designee review shall include the following:

   a. review the **Inmate Disability Accommodation Request Form** to determine if it is legible and complete. Illegible or incomplete forms shall be returned to the inmate;

   b. evaluate whether the inmate is disabled as described in the **Inmate Disability Accommodation Request Form**;

   c. evaluate the inmate's ability to perform the activities described in the **Inmate Disability Accommodation Request Form** and whether the requested accommodation will enable the inmate to perform the activities;

   d. *arrange for a current clinical evaluation of the inmate's alleged disability and/or impairment by a medical practitioner in order to validate the accommodation request;*

   e. in evaluating the inmate's request, the CHCA/designee shall take all appropriate action(s) as the CHCA deems reasonably necessary, including reviewing medical records pertaining to the inmate, arranging to have the inmate examined and/or tested by an appropriate person or persons, and/or interviewing staff and the inmate. The requests of the evaluation shall be summarized in a memorandum; and

   f. the CHCA shall refer the specific **Inmate Disability Accommodation Request Form** along with the memorandum summarizing the results of the evaluation to the Facility Manager/designee.

2. The Facility Manager review shall include the following:

Issued: 11/24/2014
Effective: 12/29/2014

*DC-ADM 006, Reasonable Accommodations for Inmates with Disabilities Procedures Manual*
*Section 2 – Accommodations*

    a. review the **Inmate Disability Accommodation Request Form**, the CHCA's memorandum summarizing the results of the investigation, and all other relevant records and make a recommendation whether the requested accommodation should be granted;

    b. in making his/her recommendation, the Facility Manager may consult with the Deputy Superintendent of Centralized Services (DSCS)/designee, the CHCA or other representative of the Medical Department, the Security Captain or other representative of the Security Office, and/or other staff person with relevant knowledge and expertise; and

    c. submit his/her recommendation to the Central Office Inmate Disability Accommodation Committee (COIDAC) along with the **Inmate Disability Accommodation Request Form** and the CHCA's memorandum, an alternative accommodation, if any, and any other information the Facility Manager deems appropriate.

3. The COIDAC shall be determined by the Secretary and shall, at a minimum, consist of two Deputy Secretaries, the Director of the Bureau of Health Care Services (BHCS), the Director of the Bureau of Treatment Services (BTS), and the ***Director of the Office of Population Management (OPM)*** or their designees. COIDAC review shall include the following:

    a. within **30** days of receiving a complete submission from the Facility Manager or longer period as may be approved by the Secretary, the COIDAC shall review the **Inmate Disability Accommodation Request Form**, the CHCA's memorandum summarizing the results of the evaluation, and the Facility Manager's recommendation; and

    b. determine whether the inmate suffers from a disability and if so, the manner in which the inmate's disability is to be accommodated. The COIDAC shall submit a memorandum to the Facility Manager outlining its determination.

4. The Facility Manager shall notify the inmate in writing of the final determination within ten working days of receiving the COIDAC's determination. An inmate who is dissatisfied with the COIDAC's determination may submit a grievance under Department policy **DC-ADM 804, "Inmate Grievance System."**

5. ***The Facility Manager may impose sanctions, at his/her discretion, on the inmate, if it is determined that the inmate's accommodation request is frivolous or malicious or not brought in good faith. Possible sanctions may include the assessment of a co-payment from the inmate's account for any evaluation and/or examination of the inmate by a medical professional in assessing the accommodation request.***

6. ***Any and all records relevant to and submitted in connection with the accommodation request shall be retained in the inmate's medical file under the Legal/Correspondence Section.***

Issued: 11/24/2014
Effective: 12/29/2014

## C. General Accommodations

In the event an inmate is diagnosed with a qualified disability, the Facility Disabilities Accommodation Coordinator shall be responsible for the following:

1. provide and update the Control Center with a roster of qualified disabled inmates to be used in the event of an emergency;

2. set up procedures, if necessary, for the transfer of a qualified disabled inmate as soon as possible once his/her condition is realized;

3. notify the Corrections Classification and Program Manager (CCPM) of the needs of a disabled inmate for placement into programs which may require special equipment and/or staff members to carry out these needs;

4. notify the Records Office so special needs can be met when transferring an inmate in accordance with policy;

5. notify the Unit Managers of these special needs when staffing inmate programs;

6. notify the Corrections Education and Vocational Coordinator (CEVC) responsible for inmate placement in job assignments (the CEVC is responsible for notifying the work supervisors of any special needs); and

7. notify the appropriate Deputy Secretary regarding any accommodations that may have an adverse impact on security.

## D. Programs/Services Accommodations

1. **Educational Programs**

   This applies to an inmate who attends school. Accommodations shall be provided to access the program(s), if needed. Information will be communicated to the inmate in a manner which will maximize the inmate's ability to comprehend and understand the information.

2. **Library Services**

   An inmate who has a qualified disability shall have access to the facility's library.

3. **Treatment Programs**

   Treatment programs include programs or services in preparation for parole or to deal with problems identified by staff. These generally include sex offender treatment, alcohol and other drugs (AOD) treatment, or other therapy classes or groups. Accommodations shall be provided to access the program(s), if needed.

Issued: 11/24/2014
Effective: 12/29/2014

4. Medical/Psychiatric Treatment

   Accommodations shall be provided to access treatment, if needed. The level and type of accommodations shall be based upon the individual needs of the inmate, as determined by the health care staff. Information will be communicated to the inmate in a manner, by the health care staff. Information will be communicated to the inmate in a manner, which will maximize the inmate's ability to comprehend and understand the information.

5. Misconduct Hearing

   Accommodations shall be provided in the hearing process, if needed. Information will be communicated to the inmate in a manner, which will maximize the inmate's ability to comprehend and understand the information.

6. Activities/Recreational/Commissary/etc.

   Special accommodations for an inmate accessing these services need not be generally provided. However, in specific cases, auxiliary aids and services may have to be provided if the affected inmate cannot otherwise communicate in order to access the service(s).

Issued: 11/24/2014
Effective: 12/29/2014

## Inmate Disability Accommodation Request Form

Complete blocks 1 through 6 below as completely as possible and submit to the Corrections Healthcare Administrator. Please write legibly or print. Forms that cannot be read will be returned.

| 1. Inmate Name: | 2. DOC Number: | 3. Date: |
|---|---|---|

| 4. Describe your physical or mental disability: |
|---|
| |

| 5. Describe the activities you wish to do that you cannot do because of your physical or mental disability: |
|---|
| |

| 6. Describe in detail the action you wish the Department to take to enable you to perform the activities described in number 5 and explain how that action will enable you to perform the activities described in number 5: |
|---|
| |

| Inmate Signature: | |
|---|---|
| CHCA Signature: | Date Received: |
| Director, Bureau of Healthcare Services: | Date Received: |

## Section 3 – Specific Disabilities

An inmate who is diagnosed as having a qualified disability will receive accommodations so that he/she can properly communicate/participate in the Department's facilities. An inmate will not be denied services solely for reason of his/her disability(ies).

### A. Local Procedures

Each Facility Manager/designee is to ensure that local procedures are developed, if needed, and maintained to ensure compliance with this policy. Each facility shall also be in compliance with **Management Directive 205.32, Hiring Sign Language Interpreters and Transliterators.**

### B. Accommodations for the Deaf and Hard of Hearing

The following is a mandatory list of services that must be provided for an inmate who is qualified as deaf or hard of hearing during emergency evacuation procedures.

1. Fire Alarm/Emergency Notification Systems

   Areas housing a deaf or hard of hearing inmate must have a flashing alarm and/or vibrating system and written procedures that direct staff to physically notify the inmate in case of an emergency. Areas such as bathrooms, Security Level 5 Housing Units, and medical isolation cells must be included in the procedures. All facilities shall comply with the National Fire Protection Association Life Safety Code, No. 101.

2. Announcements

   Any procedures or directions to an inmate that rely on a loudspeaker system must be modified to alert a deaf or hard of hearing inmate; written procedures must include these provisions.

### C. Accommodations for the Visually Impaired

A facility shall have proper evacuation procedures to include an audible emergency alarm system and provide a qualified visually impaired inmate with the proper evacuation procedures upon assignment to a facility. A copy of an inmate roster shall be maintained in the control room and used by staff to alert a qualified visually impaired inmate of an emergency. A facility housing qualified visually impaired inmates shall have Braille signage that identifies rooms, spaces, instructions, etc.

### D. Accommodations for the Mentally and/or Physically Impaired[1]

The Department shall provide an inmate diagnosed with a qualified mental and/or physical impairment assignment to a facility or Special Needs Unit that provides reasonable accommodations for this impairment. However, the Department may refuse access to

---

[1] 4-ACRS-6A-04

**DC-ADM 006, Reasonable Accommodations for Inmates with Disabilities Manual**
**Section 3 – Specific Disabilities**

recreation if participation by the  qualified disabled inmate would alter the nature of the program or activity or if it presents a valid safety concern, an undue financial burden or if the inmate is unable to perform the basic function of the activity.

*DC-ADM 006, Reasonable Accommodations for*
*Inmates with Disabilities Manual*
*Glossary of Terms*

**Auxiliary Aids and Services (as defined in 42 USCS §12102 (1))** – The term "auxiliary aids and services" includes certified interpreters or other effective methods of making aurally delivered materials available to individuals who are hard of hearing, qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments, acquisition or modification of equipment or devices, and other similar services and actions.

**Braille** – A system of writing and printing for the visually impaired, in which varied arrangements of raised dots representing letters and numerals can be identified by touch.

**Deaf** – A condition in which perceivable sound (including speech) have no meaning for ordinary life purposes. Visual communication, such as sign language, writing, text reading, and speech reading, is necessary.

**Department** – The Pennsylvania Department of Corrections.

**Direct Threat** – A significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.

**Disability (as defined in 42 USCS §12102(2); 28 CFR §35.104)** – A person with a qualified disability is defined as an individual who:

1.  has a physical or mental impairment that substantially limits one or more major life activities;

2.  has a record of such an impairment; and/or

3.  is perceived or regarded as having such an impairment.

The following conditions do not constitute disabilities: transvestitism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, other sexual behavior disorders, compulsive gambling, kleptomania, pyromania, and psychoactive substance abuse disorders resulting from current illegal use of drugs, homosexuality or bisexuality.

**Essential Job Functions (as defined in 29 CFR §1630.2(n))** – The fundamental job duties of the position the inmate with a disability holds or seeks. Essential job functions are those that bear more than a marginal relationship to the job at issue.

**Facility Disabilities Accommodation Coordinator** – The Corrections Health Care Administrator will serve as the Facility Disabilities Accommodation Coordinator.

**Hard of Hearing** – A condition in which there is some degree of hearing loss varying from mild, to moderate, to profound. The sense of hearing is partially, but not completely functional for ordinary life purposes.

**DC-ADM 006, Reasonable Accommodations for**
**Inmates with Disabilities Manual**
**Glossary of Terms**

**Major Life Activities (as defined in 28 CFR §35.104)** – Includes such functions as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

**Permanent Vision Impairment** – Individuals who are permanently blind or have a vision impairment not correctable to central vision acuity of less than 20/200, even with corrective lenses.

**Physical or Mental Impairments (which affect a major life activity) (as defined in 28 CFR §35.104)** – Physical or mental impairments include any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; and endocrine.

Any mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

The phrase physical or mental impairment includes, but is not limited to, such contagious and noncontagious diseases and conditions as orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, specific learning disabilities, HIV disease (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism. The phrase physical or mental impairment does not include homosexuality or bisexuality.

**Qualified Individual with Disability (as defined in 28 CFR §35.104)** – An individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

**Qualified Interpreter (as defined in 28 CFR §35.104)** – Refers to an interpreter for the deaf or hard of hearing who is able to interpret effectively, accurately, and impartially both receptively and expressively, using any necessary specialized vocabulary. A list of such interpreters may be obtained from the Pennsylvania Office for the Deaf and Heard of Hearing. Use of a certified interpreter shall be in accordance with **Management Directive 205.32, Hiring Sign Language Interpreters and Transliterators.**

**Reasonable Accommodation (condensed from 29 CFR §1630.2)** – A modification or adjustment to a job or work environment that will enable a qualified inmate with a disability to perform all the essential job functions and which does not create an undue hardship for the Department.

**Record of a Mental/Physical Impairment (as defined in 28 CFR §35.104)** – These procedures protect not only those individuals with disabilities who actually have a mental/physical impairment that substantially limits a major life activity, but also those with a record of such an impairment. This protected group includes a person who has a history of an impairment that substantially limits a major life activity but who has recovered from the

impairment. Examples of individuals who have a history of impairment are persons who have prior histories of mental or emotional illness, drug addiction, alcoholism, heart disease, or cancer. Persons who have been wrongly classified as having a mental impairment include persons who have been erroneously diagnosed as mentally retarded or mentally ill.

**Regarded as Having a Mental/Physical Impairment (as defined in 28 CFR §35.104)** – These procedures also protect certain persons who are regarded by a public entity as having a mental/physical impairment that substantially limits a major life activity, whether or not that person actually has an impairment. Some examples of situations covered by this category are:

1. An individual who has a physical or mental impairment that does not substantially limit major life activities, but who is treated as if the impairment does substantially limit a major life activity.

2. An individual who has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others towards the impairment.

3. An individual who has no impairments but who is treated by a public entity as having an impairment that substantially limits a major life activity.

**Undue Hardship (condensed from 29 CFR §1630.2(p))** – An action requiring significant difficulty or expense in the implementation of an accommodation or which would result in a threat to facility security.

# EXHIBIT G

# JOINT STATE
# GOVERNMENT COMMISSION
### General Assembly of the Commonwealth of Pennsylvania

## REPORT OF
## THE ADVISORY COMMITTEE
## ON GERIATRIC AND
## SERIOUSLY ILL INMATES

### JUNE 22, 2005



108 Finance Building
Commonwealth Avenue & North Street
Harrisburg, PA 17120

## DEPARTMENT OF CORRECTIONS DEFINITIONS
## AND DSM-IV DIAGNOSES

### Definitions

**MHR** – These are inmates who are mentally ill and are participating in treatment.

**PRT** – These are inmates on the MH/MR Roster who are seriously mentally ill and require closer monitoring.

**Seriously Mentally Ill** – Inmates who are seriously mentally ill have a substantial disorder of thought or mood, which significantly impairs judgment, behavior, capacity to recognize reality, or cope with the ordinary demands of life.

### DSM-IV Diagnoses

**Dementias**
Dementia
Alcohol intoxication/withdrawal delirium
Substance (amphetamine/cocaine/nicotine/opioid/ other) withdrawal
Delirium due to general medical condition
Dementia due to general medical condition (e.g., Alzheimer's)

**Schizophrenias**
Schizophrenia
Schizophrenia, Disorganized type
Schizophrenia, Catatonic type
Schizophrenia, Paranoid type
Schizophrenia, Residual type
Schizophrenia, Undifferentiated type

**Other psychotic disorders**
Schizophrenoform disorder
Schizoaffective disorder
Delusional disorder
Psychotic Disorder, Not Otherwise Specified

**Mood disorders**
Bipolar I Disorder, Single Manic Episode
Bipolar I Disorder, Recurrent Manic Episodes

Major Depressive Disorder, Single Episode
Major Depressive Disorder, Recurrent Episodes

Bipolar I Disorder, Most Recent Episode Hypomanic
Bipolar I Disorder, Most Recent Episode Depressed
Bipolar I Disorder, Most Recent Episode Mixed
Brief Psychotic  Disorder
Bipolar II Disorder
Mood Disorder, Not Otherwise Specified
Delusional Disorder, NOS
Other Non organic Psychosis

Dysthymic Disorder
Cyclothymic Disorder
Depression NOS


**Anxiety Disorders**
Anxiety Disorder, NOS
Social Phobias
Obsessive Compulsive Disorder
Acute Stress Disorder
Post Traumatic Stress Disorder


**Adjustment Disorder**:  clinically significant emotional or behavioral symptoms
in  response  to  an  identifiable  psychosocial  stressor/s.   Symptoms  are
sub-threshold for other DSM diagnoses (mainly mood and anxiety disorders).

Adjustment Disorder


**Dissociative  Disorders**:   disruption  in  usually  integrated  functioning  of
consciousness, memory, identity, or perception.  DSMIV Task Force Chairman
questioned whether these disorders exist.

Depersonalization Disorder

**Personality Disorder**:  an enduring pattern of inner experience and behavior that differ dramatically from the expectations of the person's culture, i.e., characteristics that bother other people.  These patterns are pervasive and inflexible.

**Cluster A:  odd and eccentric personality types**
Paranoid Personality Disorder
Schizoid Personality Disorder
Schizotypal Personality Disorder

**Cluster B:  dramatic, emotional, and eccentric behavior.**
Antisocial Personality Disorder
Borderline Personality Disorder
Histrionic Personality Disorder
Narcissistic Personality Disorder

**Cluster C:  anxious and fearful.**
Avoidant Personality Disorder
Dependent Personality Disorder
Obsessive Compulsive Disorder
Personality Disorder NOS

**Substance Abuse Disorders**
Alcohol Dependence
Drug Dependence
Non-Dependent Drug Abuse

**Somatoform Disorders**:  presence of physical complaints that suggest a General Medical Condition (GMC), but complaints cannot be completely explained by GMC, substances, or another disorder.

Conversion Disorder
Hypochondriasis
Somatization Disorder NOS

**Sexual and Gender Identity Issues**
Sexual Deviations

**Fictitious Disorders**
Malingering


## Disorders Usually First Diagnosed in Infancy, Childhood or Adolescence (ICA Disorders)


**Learning Disorders**
Learning Disorders


**Attention-Deficit and Disruptive Behavior Disorders**
Attention-Deficit, Hyperactivity
Conduct Disorder


**Mental Retardation**
Borderline Intellectual Functioning
Mild Mental Retardation
Moderate Mental Retardation
Severe Mental Retardation
Profound Mental Retardation
Mental Retardation, Severity Unspecified

Jori Britt, KJ-9477
SCI-Phoenix
Box 244
Collegeville, PA 19426



RECEIVED
JUL - 1 2022

To: James A. Byrne U.S. Courthouse.
Clerk of court EDPA
Room 2609
601 Market St.
Phila, PA 19106

"LEGAL MAIL"



USPS TRACKING®

9114 9022 0078 9982 4982 02

UNITED STATES
POSTAL SERVICE®

Label 400 Jan. 2013
7690-16-000-7948



PRIORITY
MAIL

UNITED STATES
POSTAL SERVICE®

For Domestic and International Use

TRACKED
★ ★ ★
INSURED

Label 107, May 2014

U.S.M.S.
X-RAY



PA DEPARTMENT OF
CORRECTIONS
INMATE MAIL

neopost
06/30/2022
US POSTAGE $009.25°
PRIORITY MAIL

ZIP 19426
041M12252211